## DENNISON MFG. CO. v. THOMAS MFG. CO.

### (Circuit Court, D. Delaware. May 5, 1899.)

#### No. 204.

1. EQUITY PLEADING—MULTIFARIOUSNESS.

The objection of multifariousness is one which addresses itself to the sound discretion of the court, and should not be sustained where the relief prayed is of the same kind with respect to the several matters complained of and is based on substantially similar considerations, and no hardship or injustice is likely to result to the defendant from the joinder of such matters.

2. TRADE-MARKS—MARKS AND NAMES SUBJECTS OF OWNERSHIP.

Nothing can legally be appropriated by any one as a trade-mark which, aside from superiority in excellence, popularity or cheapness of the article bearing it, would practically confer upon him a monopoly in the production or sale of like articles.

3. SAME.

The word "quality" is used in different senses in the cases. It is employed in some to denote the grade, ingredients or properties of an article, and in others to indicate generally the merit or excellence of an article as associated with or coming from a certain source. While there can be no valid trade-mark as denoting quality when used merely in the former sense, there may be a valid trade-mark as indicating quality when used in the latter sense.

4. SAME—UNFAIR COMPETITION.

The doctrine of unfair competition in trade rests on the proposition that equity will not permit any one to palm off his goods on the public as those of another. Unfair competition in trade as distinguished from infringement of trade-marks does not involve the violation of any exclusive right to the use of a word, mark or symbol. The word may be purely generic or descriptive, and the mark or symbol indicative only of style, size, shape or quality, and as such open to the public, yet there may be unfair competition in trade by an improper use of such word, mark or symbol.[1]

5. SAME—MANNER OF MARKING OR DRESSING GOODS.

No one has a right, intentionally, fraudulently and with purpose to deceive the public, to dress articles manufactured or sold by him by such mode of packing or numbering as to cause or be likely to cause purchasers to mistake them for those produced by a business rival.

In Equity. This was a suit in equity by the Dennison Manufacturing Company against the Thomas Manufacturing Company for alleged infringement of trade-marks, and for unfair competition in trade. Heard on demurrer to bill.

Rowland Cox and Charles W. Smith, for complainant.

Augustus T. Gurlitz and Lewis C. Vandegrift, for defendant.

BRADFORD, District Judge. The bill in this case charges infringement of certain alleged common law trade-marks and also unfair competition in trade, and prays for an injunction and an account. The defendant has demurred to the bill, alleging that it is multifarious, defective and insufficient. Both the complainant and defendant are engaged in the business of manufacturing and selling

---

[1] As to unfair competition in trade, see note to Scheuer v. Muller, 20 C. C. A. 165, and supplementary thereto note to Lare v. Harper, 30 C. C. A. 376.

stationers' supplies. The bill charges numerous instances of infringement by the defendant of alleged trade-marks of the complainant as well as unfair competition in trade on the part of the defendant. Seventy causes of demurrer have been assigned, of which the first fifty five are confined to the charge of multifariousness. While the bill relates to various articles and details of the business conducted by the defendant, the relief prayed is of the same kind with respect to all those articles and details and is based on substantially similar considerations. No hardship or injustice is likely to result to the defendant from the inclusion in one suit of the various matters complained of. On the other hand, to require the filing of separate bills relating respectively to the several matters set forth in the present bill would involve great expense and annoyance to both parties. Such a course would not subserve the convenience of either the parties or the court. The objection of multifariousness is one which addresses itself to the sound discretion of the court, and under the circumstances should not be sustained here. Oliver v. Piatt, 3 How. 333, 412; U. S. v. American Bell Tel. Co., 128 U. S. 315, 352, 9 Sup. Ct. 90; Harrison v. Perea, 168 U. S. 311, 319, 18 Sup. Ct. 129; Sheldon v. Packet Co., 8 Fed. 769; Jaros Hygienic Underwear Co. v. Fleece Hygienic Underwear Co., 60 Fed. 622; Harper v. Holman, 84 Fed. 222; Weir v. Gas Co., 91 Fed. 940.

The first of the two main questions in the case is whether the bill together with the exhibits therein referred to and made part thereof shows infringement by the defendant of common law trade-marks of the complainant. The bill alleges, among other things, that the complainant is a corporation of the state of Massachusetts, created during or about 1878, and that it thereupon succeeded to the business of the firm of Dennison & Co., consisting of the manufacture and sale of numerous articles adapted to the use of jewelers, such as paper boxes, labels, tags, jewelers' cotton, and the like, and also of numerous articles commonly sold by stationers, and that the property which in connection with the business of that firm passed to the complainant embraced the "real estate, plant and other property of every name and nature belonging to the said firm of Dennison & Co., together with the good-will of the business of said firm, and all rights of whatsoever nature thereto appertaining, including the trademarks, trade-names, designations, labels and other indicia belonging and relating to said business." The bill further alleges:

"Thereafter said business, founded and carried on as aforesaid and made over to your orator, was, without interruption continuously by your orator conducted and carried on without change, except that the said business from time to time has been very greatly enlarged and extended by your orator, branch houses and agencies for the sale of its products throughout the United States and in foreign countries having been by your orator established and conducted, with the result that your orator's business of manufacturing tags, labels and numerous other articles commonly known as stationers' specialties and jewelers' findings is, and for a long period of years has been, the most important and extensive business of its kind existing in the United States, and, your orator believes, the largest and most important in the world. * * * And your orator further says that each of the numbers, designations or marks hereinafter enumerated as having been by it used, was arbitrarily selected and applied and originally and for the first time used in connection with its business, and has

been, since the adoption thereof continuously, by your orator's predecessors and by your orator, without interruption, used and availed of in connection with the sale of the particular tag, label, check, seal or other article to which it has been appropriated.  *  *  *  And your orator avers that by reason of the premises aforesaid, and otherwise, it now has, as against this defendant and otherwise, the sole and exclusive right to use in the United States and elsewhere the said marks, numbers and designations, and each and all of them, as trade-marks in connection with the tags, labels, checks, seals and other articles to which they have severally related and been applied."

Two exhibits made part of the bill relate to sealing wax and are marked "Complainant's Wax" and "Defendant's Wax," being specimens of sealing wax with its trade dress sold by the parties respectively. The boxes containing the wax and respectively used by them are of practically the same size, form and color. On the left hand upper corner of the lid or cover of the complainant's box there is a circle containing a monogram and the words "Trade Mark," and on the right hand lower corner of the lid there is a circle of the same size as that containing the monogram in which appear the words "Four Sticks." The most prominent and controlling words on the lid are printed diagonally thereon, running from the lower left hand corner to the upper right hand corner, and are "No. 2 American Express." The word "Dennison's" appears on the upper portion of the lid immediately to the right of the circle containing the monogram, and the word "Manufacture" on the lower portion of the lid immediately to the left of the circle containing the words "Four Sticks." On the left hand upper corner of the lid or cover of the defendant's box there is a circle of the same size as those on the lid of the complainant's box, and of the same color, containing the words "Four Sticks," and on the lower right hand corner of the lid is another circle, similar in color and size, also containing the words "Four Sticks." The most prominent and controlling words on the lid, running diagonally from the lower left hand corner to the upper right hand corner of the lid, are "No. 2 American Express." Each box contains four sticks of sealing wax of substantially the same form, size and color. On each of the complainant's sticks appear a monogram and the words "No. 2 American Express," beneath which are the words "Dennison Mfg. Co." On each of the defendant's sticks appear the words "No. 2 American Express" in the place on the stick corresponding to that occupied on the complainant's sticks by the same words. On the end of the complainant's sticks appears a monogram somewhat difficult to decipher save through close observation. On the end of the defendant's sticks appears a crown. The difference between the marks on the ends of the sticks of the complainant and defendant respectively is not sufficient to attract the attention of an ordinary purchaser using the degree of care customarily employed by those purchasing such articles. The same may be said of both the sealing wax and the boxes in which it is contained. The words "American Express" are not in themselves descriptive of the article, its size or quality, and are properly the subject of exclusive appropriation as a trade-mark for sealing wax, and must under the averments of the bill be held to constitute a valid trade-mark. The bill, in my opinion, shows an infringement

by the defendant of the trade-mark of the complainant with respect
not only to the sticks of sealing wax but to the boxes in which they
are contained. In this particular the demurrer cannot be sustained.

The complainant contends that the bill and exhibits show an
exclusive right on its part to the use of certain letters and nu-
merals in connection with sundry articles of such kinds as are
manufactured and sold by the defendant as well as by the com-
plainant, and violations of that right by the defendant. This con-
tention involves an assertion that such letters and numerals as
applied to such articles are common law trade-marks of the com-
plainant. Preliminarily it should be observed that a demurrer ad-
mits matters of fact well pleaded and all reasonable inferences to
be drawn therefrom, but not mere arguments or conclusions of law
as made or drawn by the pleader. U. S. v. Des Moines Nav. & R.
Co., 142 U. S. 510, 544, 12 Sup. Ct. 308; Chicot Co. v. Sherwood,
148 U. S. 529, 13 Sup. Ct. 695. And "a fact impossible in law can-
not be admitted by a demurrer." Railroad Co. v. Palmes, 109 U.
S. 244, 253, 3 Sup. Ct. 193. The bill further alleges:

"That since the time of its incorporation your orator has continued uninter-
ruptedly to conduct and carry on the said business as the successor in business
in all things of said Dennison & Co. and has been and is now in the full, un-
disturbed and complete possession and enjoyment of the rights and properties,
all and singular, of every nature and description, belonging to its predecessors
in business, all and singular, and the business by them carried on. And your
orator says that for many years it and its predecessors have given much of their
attention to the manufacture and sale of tags, labels, cards, tickets, wrappers,
checks, seals, and the like, of many different sizes, shapes and styles.  *  *  *
And your orator says that the different styles and sizes of tags, labels, tickets
and similar goods by it produced and sold have been very numerous, consisting
in some instances of perhaps a hundred examples, more or less, each differing
from the other in size or shape and each being required to meet a specific de-
mand or adapted to a particular use to which no one of the others was adapted.
To enable and promote the sale of these numerous examples differing from each
other in essential particulars it became necessary to apply to each example a
mark or number which would indicate its origin and by whom it was made
and serve also to indicate or suggest the shape, size or style of the article.
*  *  *  It is now and has long been the custom for each manufacturer of
tags, tickets, labels, seals, wrappers and boxes, as well as each manufacturer
of steel pens, pencils, buttons, ornamental nails and many other articles which
are necessarily made in a great number of different sizes, shapes and styles,
to select, appropriate and use a series of numbers or marks arbitrarily chosen
and availed of by such manufacturer to the exclusion of all others, such cus-
tom having its origin and foundation in the necessities of the trade and being
of essential and fundamental importance.  *  *  *  Your orator's predecessors
and your orator have in connection with all the different goods which they
have produced taken the greatest pains to select and apply numbers, marks
and indicia in every instance arbitrarily chosen and having no relation what-
soever to any characteristics of the goods, which were original with them and
could be invested with a secondary meaning to indicate by whom the thing
was manufactured and also at the same time to assist in the identification of
the thing to be offered and sold. This custom or rule your orator and its
predecessors have observed continuously with all classes of goods which they
have produced, selecting and using such numbers and marks as had never been
used or availed of by others and which would effectually serve to give individ-
uality to their goods and separate and differentiate the same from the goods
of all other producers.  *  *  *  And your orator says that each and all of
its said marks and designations were adopted by your orator's predecessors
or by your orator to denote the origin of the tags, labels, seals and other ar-

ticles in connection with which they have been used. * * * And your orator further avers that by reason of the long, continuous and extensive use, extending in a majority of instances for forty years or more, of the said marks, numbers and designations in connection with the sale of your orator's tags, labels, seals and other articles, and by reason of the great popularity of said products, and each of them, and by reason of your orator's industry, zeal and expenditures in the premises and that of your orator's predecessors, it has for many years been true that said designations and marks, and each and all of them, whenever and wherever used in connection with the sale of tags, labels, checks, seals and other articles upon which they have been used, have acquired with the trade, the public and consumers a meaning and significance as denoting and identifying tags, labels, seals and other articles, and each of them, manufactured and sold by your orator and by it alone."

With the exception of the words "American Express" as applied to sealing wax, the marks, numbers, indicia and designations to which the controversy relates are letters or numerals, or both, possessing no marked peculiarity as to form or by way of ornamentation. The demurrer admits that such letters or numerals were arbitrarily selected and first applied by the complainant or its predecessors to the various articles enumerated in the bill to indicate their origin or ownership and that for many years such articles have been bought, known and recognized by consumers and the public as being solely of the complainant's manufacture by reason of the letters or numerals applied to them by the complainant or its predecessors. It appears from the bill and exhibits, however, that the letters and numerals were employed by the complainant or its predecessors not only to indicate the origin of the articles produced by it, but to denote or suggest their shape, size, style or quality. On page 17 of the complainant's catalogue are the words "Always Use the Letter when Ordering. The Number gives Size, the Letter the Quality." On many of the pages letters are used to designate either the quality of articles or their size or form, and it is nowhere stated in the catalogue that letters or numerals do or do not indicate or denote the origin or ownership of the goods therein mentioned. While letters or figures arbitrarily chosen may not, and often do not, of themselves indicate shape, size, style, grade or quality, yet, if they be attached to articles to distinguish different shapes, sizes, styles, grades or quality, they may become by association just as descriptive as words expressly defining the same. It is urged on the part of the complainant that the letters and numerals, although indicating shape, size, style or quality, have according to the allegations of the bill a secondary meaning by association, disclosing to the public origin or ownership, and consequently must be held valid trade-marks. The defendant contends that as the function of the letters and numerals was to denote shape, size, style or quality, they could not by association or otherwise constitute valid trade-marks, and that the bill in averring that they were such alleged a legal impossibility not admitted by the demurrer. Does or does not the fact that the letters and numerals, which are applied to the complainant's articles to denote their shape, size, style or quality, possess through association a secondary significance pointing to the origin or ownership of such

articles, negative the existence of a right on the part of others to use such letters and numerals in connection with the manufacture or sale of like articles? Or, in other words, does or does not the right of the complainant to use the letters and numerals in connection with articles produced by it operate to exclude any right on the part of the defendant to use the same letters and numerals in connection with articles produced by the latter and similar to those produced by the complainant? The function of a trade-mark is to indicate to the public the origin, manufacture or ownership of articles to which it is applied, and thereby secure to its owner all benefit resulting from his identification by the public with the articles bearing it. No person other than the owner of a trade-mark has a right, without the consent of such owner, to use the same on like articles, because by so doing he would in substance falsely represent to the public that his goods were of the manufacture or selection of the owner of the trade-mark, and thereby would or might deprive the latter of the profit he otherwise might make by the sale of the goods which the purchaser intended to buy. Where a trade-mark is infringed the essence of the wrong consists in the sale of the goods of one manufacturer or vendor as those of another, and it is on this ground that a court of equity protects trade-marks. It is not necessary that a trade-mark should on its face show the origin, manufacture or ownership of the articles to which it is applied. It is sufficient that by association with such articles in trade it has acquired with the public an understood reference to such origin, &c. This doctrine has repeatedly been declared by the Supreme Court. Canal Co. v. Clark, 13 Wall. 311, 323; Manufacturing Co. v. Trainer, 101 U. S. 51, 54; Medicine Co. v. Wood, 108 U. S. 218, 223, 2 Sup. Ct. 436; Menendez v. Holt, 128 U. S. 514, 9 Sup. Ct. 143; Goodyear's India-Rubber Glove Mfg. Co. v. Goodyear Rubber Co., 128 U. S. 598, 603, 9 Sup. Ct. 166; Lawrence Mfg. Co. v. Tennessee Mfg. Co., 138 U. S. 537, 546, 11 Sup. Ct. 396; Mill Co. v. Alcorn, 150 U. S. 460, 462, 14 Sup. Ct. 151. A trade-mark may consist of a name, mark, form, brand, device or symbol, although well-known, but not previously used in connection with the same article. And the Supreme Court has in several cases recognized that, subject to certain qualifications, it may consist of letters or figures. McLean v. Fleming, 96 U. S. 245, 254; Lawrence Mfg. Co. v. Tennessee Mfg. Co., 138 U. S. 537, 547, 11 Sup. Ct. 400. In the former case the court said:

"Subject to the qualification before explained, a trade-mark may consist of a name, symbol, figure, letter, form, or device, if adopted and used by a manufacturer or merchant in order to designate the goods he manufactures or sells to distinguish the same from those manufactured or sold by another, to the end that the goods may be known in the market as his, and to enable him to secure such profits as result from his reputation for skill, industry, and fidelity."

In the latter case the court, adopting language from the opinion in Manufacturing Co. v. Spear, 2 Sandf. 599, said that no one has a "right to the exclusive use of any words, letters, figures or symbols, which have no relation to the origin or ownership of the

goods, but are only meant to indicate their names or quality."
In Manufacturing Co. v. Trainer, 101 U. S. 51, 55, the court used
the following language, quoted with approval in Menendez v. Holt,
128 U. S. 514, 520, 9 Sup. Ct. 144:

"Letters or figures which, by the custom of traders, or the declaration of
the manufacturer of the goods to which they are attached, are only used to
denote quality, are incapable of exclusive appropriation, but are open to use
by any one, like the adjectives of the language."

In Coats v. Thread Co., 149 U. S. 562, 13 Sup. Ct. 966, the court
held that "mere numerals used descriptively" were not "capable
of exclusive appropriation," and said that "it is clear that neither
the words 'Best Six Cord,' nor '200 Yds.' are capable of exclusive
appropriation, as they are descriptive, and indicative only of qual-
ity and length." Nothing can legally be appropriated by any one
as a trade-mark which, aside from superiority in excellence, popu-
larity or cheapness of the articles bearing it, would practically con-
fer on him a monopoly in the production or sale of like articles.
Indeed aside from superior excellence, popularity or cheapness of
goods to which a legitimate trade-mark is applied, such trade-mark
could be of little or no value to its owner. In Canal Co. v. Clark,
13 Wall. 311, 323, the court said:

"No one can claim protection for the exclusive use of a trade-mark or trade-
name which would practically give him a monopoly in the sale of any goods
other than those produced or made by himself. If he could, the public would
be injured rather than protected, for competition would be destroyed."

A trade-mark is designed to enable one legitimately to build up
or protect his business, but not to deprive others of the right to
use necessary or proper means for carrying on an honorable com-
petition in trade. No one has a "right to appropriate a sign or a
symbol, which, from the nature of the fact it is used to signify,
others may employ with equal truth, and therefore have an equal
right to employ for the same purpose." Canal Co. v. Clark, 13
Wall. 311, 324. Hence no one can acquire an exclusive right to the
use, as a trade-mark, of a generic name, or word, which is merely
descriptive of an article, or a sign, symbol, figure, letter, brand,
form or device, which either on its face or by association indicates
or denotes merely grade, quality, class, shape, style, size, ingredi-
ents or composition of an article, or a word or words in common
use designating locality, section or region of country. The word
"quality" is used in different senses in the cases. It is employed
in some to denote the grade, ingredients or properties of an arti-
cle, and in others to indicate generally the merit or excellence of
an article as associated with or coming from a certain source.
While there can be no valid trade-mark as denoting quality when
used merely in the former sense, there may be a valid trade-mark
as indicating quality when used in the latter sense. Thus in Mc-
Lean v. Fleming, 96 U. S. 245, 253, the court said:

"Such a proprietor, if he owns or controls the goods which he exposes to sale,
is entitled to the exclusive use of any trade-mark adopted and applied by him
to the goods, to distinguish them as being of a particular manufacture and
quality," &c.

94 F.—42

In Medicine Co. v. Wood, 108 U. S. 218, 222, 2 Sup. Ct. 439, the court said:

"He may thus notify the public of the origin of the article and secure to himself the benefits of any particular excellence it may possess from the manner or materials of its manufacture. His trade-mark is both a sign of the quality of the article and an assurance to the public that it is the genuine product of his manufacture."

In Menendez v. Holt, 128 U. S. 514, 520, 9 Sup. Ct. 144, the court, speaking of the words "La Favorita" as applied to flour, said:

"It was equivalent to the signature of Holt & Co. to a certificate that the flour was the genuine article which had been determined by them to possess a certain degree of excellence. * * * And the fact that flour so marked acquired an extensive sale, because the public discovered that it might be relied on as of a uniformly meritorious quality, demonstrates that the brand deserves protection rather than it should be debarred therefrom, on the ground, as argued, of being indicative of quality only."

The letters and numerals in question, taken severally, may fairly be considered such as by the custom of traders are used to denote size, style, quality, &c. of articles in trade, and hence the complainant is not entitled to a monopoly in those letters and numerals, possibly to the inconvenience or detriment of other traders in articles similar to those manufactured and sold by him. Nothing that is here said is intended to convey an idea that figures, like letters, may not be so combined as to constitute a valid trade-mark, or that a single letter or figure may not be so peculiar and unusual in form or ornamentation as to answer the same purpose. The court is dealing only with the case before it. It appears from the bill and exhibits, as before stated, that the letters and numerals were adopted to denote or indicate the origin or ownership, as well as the shape, size, style and quality of the complainant's goods; but it does not clearly appear whether such letters or figures were adopted primarily for the purpose of indicating their origin or ownership. On the face of the bill and exhibits there is a serious question whether it does not appear that the letters and figures only secondarily pointed to origin or ownership. But it is settled that a valid trade-mark cannot exist unless it point either by itself or by association primarily to origin, manufacture or ownership. In Lawrence Mfg. Co. v. Tennessee Mfg. Co., 138 U. S. 537, 547, 11 Sup. Ct. 400, the court said:

"Nothing is better settled than that an exclusive right to the use of words, letters or symbols, to indicate merely the quality of the goods to which they are affixed, cannot be acquired. And while if the primary object of the mark be to indicate origin or ownership, the mere fact that the article has obtained such a wide sale that it has also become indicative of quality, is not of itself sufficient to debar the owner from protection, and make it the common property of the trade (Burton v. Stratton, 12 Fed. 696), yet if the device or symbol was not adopted for the purpose of indicating origin, manufacture or ownership, but was placed upon the article to denote class, grade, style or quality, it cannot be upheld as technically a trade-mark."

In Mill Co. v. Alcorn, 150 U. S. 460, 463, 14 Sup. Ct. 152, the court said:

"(1) That to acquire the right to the exclusive use of a name, device, or symbol, as a trade-mark, it must appear that it was adopted for the purpose

of identifying the origin or ownership of the article to which it is attached, or that such trade-mark must point distinctively, either by itself or by association, to the origin, manufacture, or ownership of the article on which it is stamped. It must be designed as its primary object and purpose, to indicate the owner or producer of the commodity, and to distinguish it from like articles manufactured by others. (2) That if the device, mark, or symbol was adopted or placed upon the article for the purpose of identifying its class, grade, style, or quality, or for any purpose other than a reference to or indication of its ownership, it cannot be sustained as a valid trade-mark."

While the doctrine enunciated in the second paragraph above, quoted may possibly be the subject of future modification in a case involving a decision of the point, the court must hold in the light of the authorities that the bill cannot be sustained in so far as it charges infringement of trade-marks, save in the instance of the words "American Express" as applied to sealing wax.

The second of the two principal questions in the case is whether the bill and exhibits show unfair competition in trade by the defendant so far as the complainant is concerned. The gradual but progressive judicial development of the doctrine of unfair competition in trade has shed lustre on that branch of our jurisprudence as an embodiment, to a marked degree, of the principles of high business morality, involving the nicest discrimination between those things which may, and those which may not, be done in the course of honorable rivalry in business. This doctrine rests on the broad proposition that equity will not permit any one to palm off his goods on the public as those of another. The law of trade-marks is only one branch of the doctrine. But while the law of trade-marks is but part of the law of unfair competition in trade, yet when the two are viewed in contradistinction to each other an essential difference is to be observed. The infringement of trade-marks is the violation by one person of an exclusive right of another person to the use of a word, mark or symbol. Unfair competition in trade, as distinguished from infringement of trade-marks, does not involve the violation of any exclusive right to the use of a word, mark or symbol. The word may be purely generic or descriptive, and the mark or symbol indicative only of style, size, shape, or quality, and as such open to public use "like the adjectives of the language," yet there may be unfair competition in trade by an improper use of such word, mark or symbol. Two rivals in business competing with each other in the same line of goods may have an equal right to use the same words, marks or symbols on similar articles produced or sold by them respectively, yet if such words, marks, or symbols were used by one of them before the other and by association have come to indicate to the public that the goods to which they are applied are of the production of the former, the latter will not be permitted, with intent to mislead the public, to use such words, marks, or symbols in such a manner, by trade dress or otherwise, as to deceive or be capable of deceiving the public as to the origin, manufacture or ownership of the articles to which they are applied; and the latter may be required, when using such words, marks, or symbols, to place on articles of his own production or the packages in which they are

usually sold something clearly denoting the origin, manufacture or ownership of such articles, or negativing any idea that they were produced or sold by the former. In Coats v. Thread Co., 149 U. S. 562, 566, 13 Sup. Ct. 967, the court said:

"Irrespective of the technical question of trade-mark, the defendants have no right to dress their goods up in such manner as to deceive an intending purchaser, and induce him to believe he is buying those of the plaintiff. Rival manufacturers may lawfully compete for the patronage of the public in the quality and price of their goods, in the beauty and tastefulness of their enclosing packages, in the extent of their advertising, and in the employment of agents, but they have no right, by imitative devices, to beguile the public into buying their wares under the impression they are buying those of their rivals."

This subject was exhaustively examined and admirably explained in the following two recent cases; one decided by the House of Lords in March, 1896, and the other by the Supreme Court in May of the same year. In Reddaway v. Banham [1896] App. Cas. 199, it was held that one person was not entitled to pass off his goods as those of another by selling them under a name which was likely to deceive purchasers, whether immediate or ultimate, into the belief that they were buying the goods of the former, although the name used was in its primary meaning merely a true description of the goods. The plaintiffs had during several years made belting largely composed of camel hair, and sold it as "Camel Hair Belting," which name had come to mean in the trade the plaintiffs' belting and nothing else. Afterwards the defendants sold belting made of the yarn of camel's hair, stamping it "Camel Hair Belting," so that it was likely to mislead purchasers into the belief that it was the plaintiffs' belting, thus endeavoring to pass off their goods as those of the plaintiffs. It was held that the plaintiffs were entitled to an injunction restraining the defendants from using the words "Camel Hair" as descriptive of or in connection with belting manufactured by the defendants or belting other than of the plaintiffs' manufacture, sold or offered for sale by the defendants, without clearly distinguishing such belting from that of the plaintiffs. Lord Halsbury, L. C., in his address moving for judgment for the plaintiffs, said:

"For myself, I believe the principle of law may be very plainly stated, and that is, that nobody has any right to represent his goods as the goods of somebody else. How far the use of particular words, signs, or pictures does or does not come up to the proposition which I have enunciated in each particular case must always be a question of evidence, and the more simple the phraseology, the more like it is to a mere description of the article sold, the greater becomes the difficulty of proof; but if the proof establishes the fact the legal consequence appears to follow. * * * It would be impossible, for instance, to say that a trader could not describe his goods truly by enumerating the particulars of what they consisted, unless such description was calculated to deceive and make his goods pass as the goods of another. What in each case or in each trade will produce the effect intended to be prohibited is a matter which must depend upon the circumstances of each trade, and the peculiarities of each trade. It would be very rash a priori to say how far a thing might or might not be described, without being familiar with the technology of the trade."

Lord Herschell said:

"For many years belting made of camel hair yarn had been known in the markets of the world. It had been sold under a variety of names. But there

was ample evidence to justify the finding, that amongst those who were the purchasers of such goods, the words 'camel hair" were not applied to belting made of that material in general; that, in short, it did not mean in the market belting made of a particular material, but belting made by a particular manufacturer. * * * I cannot help saying that, if the defendants are entitled to lead purchasers to believe that they are getting the plaintiffs' manufacture when they are not, and thus to cheat the plaintiffs of some of their legitimate trade, I should regret to find that the law was powerless to enforce the most elementary principles of commercial morality. * * * The name of a person, or words forming part of the common stock of language, may become so far associated with the goods of a particular maker that it is capable of proof that the use of them by themselves without explanation or qualification by another manufacturer would deceive a purchaser into the belief that he was getting the goods of A when he was really getting the goods of B. In a case of this description the mere proof by the plaintiff that the defendant was using a name, word, or device which he had adopted to distinguish his goods would not entitle him to any relief. He could only obtain it by proving further that the defendant was using it under such circumstances or in such manner as to put off his goods as the goods of the plaintiff. If he could succeed in proving this I think he would, on well-established principles, be entitled to an injunction. In my opinion, the doctrine on which the judgment of the Court of Appeal was based, that where a manufacturer has used as his trade-mark a descriptive word he is never entitled to relief against a person who so uses it as to induce in purchasers the belief that they are getting the goods of the manufacturer who has theretofore employed it as his trade-mark, is not supported by authority, and cannot be defended on principle. I am unable to see why a man should be allowed in this way more than in any other to deceive purchasers into the belief that they are getting what they are not, and thus to filch the business of a rival. * * * I rather demur, however, to the statement of James, L. J., that the defendant in Wotherspoon v. Currie [L. R. 5 H. L. 508] was not telling a lie in calling his starch 'Glenfield starch,' as I do to the view that the defendants in this case were telling the simple truth when they sold their belting as camel hair belting. I think the fallacy lies in overlooking the fact that a word may acquire in a trade a secondary signification differing from its primary one, and that if it is used to persons in the trade who will understand it, and be known and intended to understand it in its secondary sense, it will none the less be a falsehood that in its primary sense it may be true. A man who uses language which will convey to persons reading or hearing it a particular idea which is false, and who knows and intends this to be the case, is surely not to be absolved from a charge of falsehood because in another sense which will not be conveyed and is not intended to be conveyed it is true."

## Lord Macnaghten said:

"The substance of Reddaway's complaint, as I understand it, is that Mr. Banham is putting his goods on the market under a designation which enables purchasers from him to make a false representation to their customers. It is immaterial that the designation in question, taken by itself, would convey to a person not conversant with the trade information which cannot be called untrue if by means of that designation Mr. Banham does make, not perhaps directly, but certainly through the medium of other persons, a false representation that his goods are the goods of Reddaway. * * * The appellants concede—they cannot indeed any longer dispute—that everybody who makes belting of camel hair is entitled to describe his belting as camel hair belting provided he does so fairly. But they contend, and I think with reason, that neither Banham nor anybody else is entitled to steal Reddaway's trade under color of imparting accurate and possibly interesting information. * * * The learned counsel for the respondents maintained that the expression 'camel hair belting' used by Banham was the 'simple truth.' Their proposition was that 'where a man is simply telling the truth as to the way in which his goods are made, or as to the materials of which they are composed, he cannot be held liable for mistakes which the public may make.' That seems to me to be rather begging the question. Can it be said that the description 'camel hair belting' as used by Banham is the simple truth? I will not call it an

abuse of language to say so, but certainly it is not altogether a happy expression. The whole merit of that description, its one virtue for Banham's purposes, lies in its duplicity. It means two things. At Banham's works, where it cannot .mean Reddaway's belting, it may be construed to mean belting made of camel's hair; abroad, to the German manufacturer, to the Bombay mill-owner, to the up-country native, it must mean Reddaway's belting; it can mean nothing else. I venture to think that a statement which is literally true, but which is intended to convey a false impression, has something of a faulty ring about it; it is not sterling coin; it has no right to the genuine stamp and impress of truth."

In Singer Mfg. Co. v. June Mfg. Co., 163 U. S. 169, 16 Sup. Ct. 1002, the court, after holding that on the expiration of a patent the right to make the thing theretofore covered by it as well as the generic designation which the thing acquired during the existence of the monopoly passed by dedication to the public, said:

"But it does not follow, as. a consequence of a dedication, that the general power, vested in the public, to make the machine and use the name imports that there is no duty imposed, on the one using it, to adopt such precautions as will protect the property of others and prevent injury to the public interest, if by doing so no substantial restriction is imposed on the right of freedom of use. This principle is elementary and applies to every form of right, and is generally expressed by the aphorism sic utere tuo ut alienum non lædas. This qualification results from the same principle upon which the dedication rests, that is, a regard for the interest of the public and the rights of individuals. It is obvious that if the name dedicated to the public, either as a consequence of the monopoly or by the voluntary act of the party, has a twofold significance, one generic and the other pointing to the origin or manufacture and the name is availed of by another without clearly indicating that the machine, upon which the name is marked, is made by him, then the right to use the name because of its generic signification, would imply a power to destroy any good will which belonged to the original maker. It would import, not only this, but also the unrestrained right to deceive and defraud the public by so using the name as to delude them into believing that the machine made by one person was made by another. To say that a person who has manufactured machines under a patented monoply can acquire no good will, by the excellence of his work, or the developement of his business, during the patent, would be to seriously ignore rights of private property, and would be against public policy, since it would deprive the one enjoying the patent. of all incentive to make a machine of a good quality, because at its termination all the reputation or good will resulting from meritorious work would be subject to appropriation by every one. On the other hand, to compel the one who uses the name after the expiration of the patent, to indicate that the articles are made by himself, in no way impairs the right of use, but simply regulates and prevents wrong to individuals and injury to the public. This fact is fully recognized by the well settled doctrine which holds that although 'every one has the absolute right to use his own name honestly in his own business, even though he may thereby incidentally interfere with and injure the business of another having the same name. In such case the inconvenience or loss to which those having a common right are subjected is damnum absque injuria. But although he may thus use his name, he cannot resort to any artifice or do any act calculated to mislead the public as to the identity of the business firm or establishment, or of the article produced by them, and thus produce injury to the other beyond that which results from the similarity of name.' * * * Where the name is one which has previously thereto come to indicate the source of manufacture of particular devices, the use of such name by another, unaccompanied with any precaution or indication, in itself amounts to an artifice calculated to produce the deception alluded to in the foregoing adjudications. * * * The result, then, of the American, the English and the French doctrine universally upheld is this, that where, during the life of a monopoly created by a patent, a name, whether it be arbitrary or be that of the inventor, has become, by his con-

sent, either express or tacit, the identifying and generic name of the thing patented, this name passes to the public with the cessation of the monopoly which the patent created. Where another avails himself of this public dedication to make the machine and use the generic designation, he can do so in all forms, with the fullest liberty, by affixing such name to the machines, by referring to it in advertisements and by other means, subject, however, to the condition that the name must be so used as not to deprive others of their rights or to deceive the public, and, therefore, that the name must be accompanied with such indications that the thing manufactured is the work of the one making it, as will unmistakably inform the public of that fact."

Certain exhibits, made a part of the bill, relate to gummed labels, including "Complainant's Gummed Labels" A, B, C, and D, and "Defendant's Gummed Labels" A, B, C, and D. The defendant's gummed labels contained in exhibit "Defendant's Gummed Labels A" are of the same size, shape and color as those contained in exhibit "Complainant's Gummed Labels A." There is no word, letter or figure to distinguish the labels from each other. A dozen small boxes are packed by the parties respectively in each of the larger boxes. All of the small boxes are of substantially the same size, shape and color, and contain the same number of labels. On the lid of each of the small boxes of the complainant is a label in all respects similar to those within it, save that it has printed on it "Dennison's 223." On the lid of each of the small boxes of the defendant is a similar label containing only the number "223." The large box of each of the parties is of substantially the same size and shape; that of the complainant being gray, and that of the defendant salmon colored. On one end of the complainant's box on a label similar to those in the small boxes are the word and number "Dennison's 223," and on one end of the lid are the words in block capitals "Extra Gummed." On one end of the defendant's box on a label similar to the complainant's is the number "223," and on one end of the lid are the words in block capitals, similar to those used by the complainant, "Extra Gummed." In the case of both parties the words "Extra Gummed" are on a label unlike those contained in the small boxes, but precisely similar to each other. On the top of the lid of the complainant's large box the following appears: "1 Dozen. Dennison's Gummed Labels are warranted perfect in sticking qualities, full count, and well printed and cut." There are no words or figures on the top of the lid of the defendant's large box. A comparison of the exhibit "Defendant's Gummed Labels B" with the exhibit "Complainant's Gummed Labels B" shows a similar condition of things, save in the following particulars. The boxes and labels are larger, each large box containing ten small boxes. The small boxes of the complainant and defendant are numbered "2004"; those of the complainant having also the number and word "100 Dennison's" above the numeral "2004." The label on the end of the complainant's large box bears the following: "1000 Dennison's 2004," while that on the end of the defendant's large box contains merely the number "2004"; and on the lid the number "1000" is substituted for "1 Dozen." A comparison of the exhibit "Defendant's Gummed Labels C" with the exhibit "Complainant's Gummed Labels C," shows a condition of things similar in all respects to that disclosed in the complain-

ant's and defendant's exhibits A, except as to size, and that both the large and small boxes of the defendant and complainant are numbered "209." And precisely the same statement which has been made as to exhibits C is applicable to the exhibit "Defendant's Gummed Labels D" when compared with "Complainant's Gummed Labels D," except that both the large and small boxes of the parties are numbered "201." It should be added that on the large boxes shown in the defendant's exhibits C and D there is a paper band apparently for the purpose of holding the lid to the box, containing a black star with a white circle in its center. Within the circle are the letters "T M Co" and the words, "One Dozen Boxes Gum Labels Double Gummed," are on the band beneath the star. This band, however, is not fastened in any manner to the boxes and readily slides off of them, and on sale of the labels may or may not be removed or replaced. It is in the highest degree unreasonable to assume that, after the complainant had adopted the numbers "223," "2004," "209" and "201" in connection with certain trade dress for certain sizes and styles of labels to which they were applied, the defendant's use of the same numbers and substantially the same trade dress, with the omission of its name, in connection with the same sizes and styles of labels, was an accidental coincidence. It is true that the complainant's boxes bore its name, but it is a fact of much significance that the boxes of the defendant did not bear its name, or any word, mark or figure to distinguish them from the complainant's, or to indicate that the labels therein contained were put on the market by the defendant or by any person other than the complainant. The bill charges that the trade dress and numbers, as used by the defendant in connection with the gummed labels, were a fraudulent imitation by it of the trade dress and numbers as applied by the complainant to similar labels, and that the purpose of the defendant in resorting to such fraudulent imitation was to deceive the trade and the public. The defendant had an equal right with the complainant to manufacture and sell the same sizes and styles of labels, but not intentionally and fraudulently to dress them by such a mode of packing or numbering as to cause or be likely to cause purchasers to mistake them for those produced by the complainant. In U. S. v. American Bell Tel. Co., 128 U. S. 315, 356, 9 Sup. Ct. 93, the court said:

"It is a mistake to suppose that in stating the facts which constitute a fraud, where relief is sought in a bill in equity, *all* the evidence which may be adduced to prove that fraud must be recited in the bill. It is sufficient if the main facts or incidents which constitute the fraud against which relief is desired shall be fairly stated, so as to put the defendant upon his guard and apprise him of what answer may be required of him."

And here, as was said by the court in City of St. Louis v. Knapp Co., 104 U. S. 658, 661, "while the allegations might have been more extended, without departing from correct rules of pleading, they distinctly apprise the defense of the precise case it is required to meet." On this demurrer it must, in view of the averments in the bill, be held that the defendant sought by imitative devices, likely

to prove successful, to beguile the public into buying its goods under the impression that they were those of the complainant, and therefore was guilty of unfair competition in trade.

Reference is made in the bill, among other things, to two exhibits, made part of the bill, marked, respectively, "Complainant's Price List of Gummed Paper" and "Defendant's Price List." Both relate to adhesive paper, of different colors and give samples of the same. Each sample contains a numeral, the name of the color and the dimensions, in figures, of a full sized sheet. Each of the complainant's samples has printed on it "Dennison's Gummed Paper," and each of those of the defendant bears the words "Thomas Mfg. Co. Gummed Paper." Aside from the words "Dennison's Gummed Paper" and "Thomas Mfg. Co. Gummed Paper," samples of the paper of the parties respectively, are marked as follows:

| Complainant's Samples. | Defendant's Samples. | Complainant's Samples. | Defendant's Samples. |
|---|---|---|---|
| No. 1. White Folio. Size 17x22. | No. 1. White Folio. Size 17x22. | No. 2. White Folio. Size 17x22. | No. 2. White Folio. Size 17x22. |
| No. 02. All Rope, Tea. Size 20x24. | No. 02. All Rope, Tea. Size 20x24. | No. 3½. Salmon Medium. Size 20x25. | No. 3½. Salmon Medium. Size 20x25. |
| No. 4. Yellow Medium. Size 20x25. | No. 4. Yellow Medium. Size 20x25. | No. 14. Green Plated. Size 20x24. | No. 14. Green Plated. Size 20x24. |
| No. 5. Blue Medium. Size 20x25. | No. 5. Blue Medium. Size 20x25. | No. 15. Green Glazed. Size 20x24. | No. 15. Green Glazed. Size 20x24. |
| No. 6. Green Medium. Size 20x25. | No. 6. Green Medium. Size 20x25. | No. 18. Ultramarine Blue Plated. Size 20x24. | No. 18. Ultramarine Blue Plated. Size 20x24. |
| No. 7. Dark Pink Medium. Size 20x25. | No. 7. Dark Pink Medium. Size 20x25. | No. 20. Vermillion Plated. Size 20x24. | No. 20. Vermillion Plated. Size 20x24. |
| No. 9. Light Pink Medium. Size 20x25. | No. 9. Light Pink Medium. Size 20x25. | No. 20½. Vermillion Glazed. Size 20x24. | No. 20½. Vermillion Glazed. Size 20x24. |
| No. 11. Salmon Plated. Size 20x24. | No. 11. Salmon Plated. Size 20x24. | No. 22. Coated Label Paper. Size 17x22. | No. 22. Coated Label Paper. Size 17x22. |
| No. 13. Orange Plated. Size 20x24. | No. 13. Orange Plated. Size 20x24. | No. 23. Buff Plated. Size 20x24. | No. 23. Buff Plated. Size 20x24. |

The color of each sample corresponds with its name, and, while in a few instances a sample similarly marked by the complainant

and defendant varies appreciably in shade of color, in most cases they are indistinguishable to the ordinary observer. Accidental coincidence is out of the question so far as the numbers, the names and the sizes on these samples, in their sequence, are concerned. In these particulars the defendant's samples are manifestly a studied imitation of those of the complainant. The bill alleges with respect to these price lists as follows:

"That the defendant, at the time and place aforesaid, in fraudulent imitation of your orator's said price list and for the purpose of deceiving the trade and public, has made and used a book or price list which is a studied imitation of your orator's said price list. * * * And your orator says, on information and belief, that the defendant, having prepared large numbers of price lists like that herewith produced and marked 'Defendant's Price List,' has distributed the same for use in the trade and by dealers, in fraudulent violation of your orator's rights, whereby the public have been misled and unfair competition in business promoted, and your orator's sales reduced, to its great loss and injury actually sustained."

The front and back covers of "Defendant's Price List" radically differ from the front and back covers of "Complainant's Price List of Gummed Paper." The former state in prominent words that the gummed papers are manufactured by the defendant, while the latter state with equal clearness that the gummed papers are manufactured by the complainant. Each sample of the complainant bears its name, and the name of the defendant is on each of its samples. The bill does not charge fraudulent combination between the defendant and dealers, to whom its price lists are furnished, to deceive purchasers as to the origin, manufacture or ownership of the gummed paper. Substantially the same may be said of the other price lists and catalogues of the respective parties. The bill does not allege whether the gummed paper of the defendant as sold in the market does or does not bear any distinguishing marks or words, nor describe the style or characteristics of its trade dress or packing. Details and circumstances necessary for the formation of an intelligent opinion are not disclosed. The same considerations apply to other causes of complaint alleged in the bill. The bill and exhibits show on their face that the complainant is entitled to some relief, and with respect to other relief prayed a decision should be reached, not on demurrer, but after a full hearing of the case on such evidence as shall be adduced. Brooke v. Hewitt, 3 Ves. 253; Verplank v. Caines, 1 Johns. Ch. 57. A case much in point in this immediate connection is Merriam v. Publishing Co., 43 Fed. 450, where Mr. Justice Miller, in delivering the opinion of the court overruling the demurrer, said:

"Now, taking all of these allegations together, there may be some evidence of a fraudulent intent on defendants' part to get the benefit of the reputation of the edition of Webster's Dictionary which the complainants are publishing, and it may possibly be that, in consequence of the facts averred, the public are deceived, and that the complainants are damaged to some extent. We think, therefore, that this is one of those cases where, as the facts are stated in the complaint, the interests of justice would be best subserved by requiring the defendants to answer, so that there may be a full and fair investigation of the law and facts upon a final hearing."

In view of these authorities it is unnecessary to decide whether the demurrer in this case should be treated as a single demurrer to

the whole bill, or as in effect several demurrers applicable to different portions of the bill, and collectively covering all of it.

The demurrer must be overruled and the defendant be required to make answer to the bill by the first Monday in June next.