Leo J. Grills *vs.* Adam John Miller & another.

Hampden.    September 18, 1947. — November 24, 1947.

Present: Qua, C.J., Lummus, Ronan, Wilkins, & Williams, JJ.

*Equity Jurisdiction*, Accounting, Trade mark, Plaintiff's clean hands. *Trade Mark. Personal Property*, Ownership. *Joint Enterprise.*

Neither party to a contract between one engaged in "sales promotion" and a manufacturer of the product to be sold by the promoter could maintain a suit in equity for an accounting between them where it appeared that each continuously had engaged in a course of deliberate and intentional wrongful conduct, harmful to the other, in breach of the contract.

The mere fact that the plaintiff in a suit in equity, because of breaches on his part of a contract with the defendant as to the plaintiff's promoting sale of a product manufactured by the defendant, was not entitled to an accounting with the defendant respecting operations under the contract, did not preclude the plaintiff from recovering from the defendant the value of cartons, the property of the plaintiff, left in the possession of the defendant and appropriated by him to his own use.

In a suit in equity against a manufacturer under contract with the plaintiff as exclusive sales promoter of a product manufactured by the defendant, a final decree should not have declared that the plaintiff was "the rightful owner of" a certain trade mark nor have required the defendant to assign that trade mark to him, but was correct in enjoining the defendant from improperly using the trade mark, where it appeared that, although the plaintiff thought of the trade mark first in a conference with the defendant, it was devised for use in the common enterprise of selling the product to which their contract related: each party had a legal interest in the trade mark and their rights must be adjusted with regard to the special circumstances which they must be deemed to have known when they began using it.

The mere fact, that a sales promoter had continuously, intentionally and deliberately adopted a wrongful course of conduct in breach of a contract with a manufacturer giving him exclusive rights respecting the sale of the manufacturer's product, did not preclude him from relief in equity against improper use by the manufacturer, after both parties had ceased operations under the contract, of a trade mark which had been used to designate the product ·and in which each had a legal interest.

BILL IN EQUITY, filed in the Superior Court on May 24, 1946.

The suit was heard by *Giles*, J. The provisions of the final decree entered by his order, were (1) that the plaintiff was "the rightful owner of the trade name 'Sealskin'"; (2) that the defendant execute all documents necessary to transfer to the plaintiff ownership of the trade name and trade mark founded thereon; (3) that the defendant be enjoined from using the trade name · "directly or indirectly in any trade or business without the consent of the plaintiff or his heirs or assigns"; (4) and (5) that the defendant pay to the plaintiff $1,125 and interest for fifteen thousand shipping cartons· of the plaintiff which the plaintiff ·had "appropriated . . . to his own use"; (6) that the plaintiff was entitled to an accounting with the defendant, on which (7) there was due the plaintiff from the defendant $1,342 and from the plaintiff to the defendant $76.98, so that

(8) the defendant should pay the plaintiff $1,265.02 and interest; (9) that the defendant also pay costs to the plaintiff; and (10) that the Worcester County Trust Company be enjoined from honoring withdrawals from accounts of the defendant with it until the defendant made such payments to the plaintiff as directed.

*J. J. Siarkiewicz,* (*H. Zarrow* with him,) for the defendant Miller.

*W. A. Godfrey & J. S. Bulkley,* for the plaintiff, submitted a brief.

QUA, C.J. This suit in equity arises out of a contract entered into between the plaintiff and the defendant Miller, hereinafter called the defendant, under date of May 27, 1943, by which the plaintiff was to have for a term of ten years (and for a further term of ten years, unless he should give notice of his intention not to continue) the sole and exclusive right to sell and distribute skin "creams" manufactured by the defendant, including a product later bearing the trade mark "Sealskin," designed to protect the skins of persons employed in industry.

The bill alleges breaches of the contract by the defendant and that the defendant has appropriated to his own use a quantity of cartons furnished by the plaintiff to be used exclusively on products to be sold by the plaintiff, and asserts that the plaintiff is the sole owner of the name "Sealskin." The prayers are for an accounting, that the contract be cancelled, that the defendant be ordered "to transfer and assign all of his rights in the trade mark 'Sealskin'" to the plaintiff, and for injunctive relief and damages. The defendant by counterclaim alleges breaches of the contract by the plaintiff for which he claims compensation.

The facts appear from the report of a master, which was confirmed by interlocutory decree. A final decree was entered charging the defendant with a sum of money as due upon an accounting and with the value of the cartons, and granting to the plaintiff substantially the relief prayed for with respect to the trade mark. The defendant appeals from both decrees, but as he has not argued his exceptions to the master's report, we deem them to have been waived.

The defendant was a manufacturer of certain types of skin "creams." The plaintiff was engaged in "sales promotion." By the terms of the contract the defendant, in addition to granting to the plaintiff the exclusive right of sale hereinbefore mentioned (with an exception not now material), agreed to deliver to the plaintiff or to persons designated by him all of said products required by him at specified prices, a certain percentage of which was to be credited to the plaintiff's account to meet payments made by the plaintiff for advertising and promotion costs, to package said products, to label the same in accordance with written instructions from the plaintiff, to turn them over to transportation agencies for delivery to persons designated by the plaintiff, not to sell to any person other than the plaintiff, and to send the bills to the plaintiff only. The plaintiff agreed to cause advertising matter to be printed and distributed, to "devote his entire time and attention and to use his best endeavors to the business of selling" the defendant's products, and guaranteed "a minimum quota of shipments of 4000 gross yearly." Both parties agreed to keep proper accounts and to make adjustments monthly.

Immediately upon executing the contract the parties began operating under it. The plaintiff instituted an extensive advertising campaign and established distributors in every State in the United States and some in Canada. The defendant made shipments to the plaintiff or to persons designated by him and in either case billed the plaintiff for the goods. The plaintiff collected from the purchasers and remitted to the defendant according to the contract. In July or August, 1943, the plaintiff became convinced that the "beauty trade" offered a large field for the defendant's product, but felt that in this field a new name must be devised for the product. At a conference between the parties the plaintiff, without help from the defendant, thought of and suggested the name "Sealskin," to which the defendant agreed. Thereupon the plaintiff prepared a new label using that name and advertised extensively and sold large quantities of the product under that label. The name became

well and favorably known to the "beauty trade" and "has considerable value in that connection." The plaintiff had no formula for the manufacture of the product and never manufactured any. It does not appear, however, that the manufacture was a secret process known only to the defendant or that "creams" similar for all practical purposes to "Sealskin" were not readily obtainable in the market.

The defendant in violation of his contract made many direct sales to dealers, collected for such sales, and failed to account to the plaintiff for the collections. On the other hand, the plaintiff by false representations induced the defendant to make a special low price for a supposedly large purchaser, who was not in fact a purchaser at all. The plaintiff himself took over goods consigned to this supposed purchaser and sold them at the regular rates, keeping the difference, and thus defrauding the defendant of substantial sums. As a result of these breaches by both parties a conference was held in September, 1945, at which each party accused the other of the respective breaches above mentioned, and at which they finally "mutually agreed to forget their grievances and to continue to operate under the written contract." Again, however, each broke the contract. The plaintiff broke it by devoting substantial amounts of his time during practically all of the remainder of the period during which the parties attempted to operate under the contract to one or the other of two corporations from which he received substantial payments for his services. He gave up the office he had previously maintained for the sale of the defendant's products and took up quarters in the office of one of these corporations. This was in violation of his promise to devote his entire time and attention to the selling of the defendant's product. The defendant on his part broke the contract by continuing to make direct sales to customers for which he collected but did not account. He also made a fraudulent conveyance to prevent the plaintiff from collecting in this suit, and he introduced in evidence at the hearings before the master documents which the master finds he had fraudulently

altered. The master finds that "In May of 1946 the plaintiff and the defendant ceased operations under the contract." Neither party now makes any claim under the contract for any period after that time. A finding of the master that neither party is entitled to damages against the other has gone unchallenged and must stand. We interpret this in its context to refer to unliquidated damages as for breach of contract and not to any balance that might be found due upon an accounting.

It appears to us that neither the plaintiff nor the defendant is in a position to insist in a court of equity upon an accounting against the other. Even if we assume that the agreement of the parties in September, 1945, to forget their grievances and to continue to operate under the contract amounted to mutual releases of whatever claims then existed by either against the other, both parties thereafter continued in a course of deliberate and intentionally wrongful conduct. No excuse is suggested for the plaintiff's course of action in devoting his time and effort to other enterprises. That course deprived the defendant of the plaintiff's undivided attention for which the defendant had expressly stipulated and may well have caused loss, the amount of which is not susceptible of proof, in respect to the very matters in relation to which the plaintiff now calls for an accounting. None of the circumstances which led the court to grant relief to the plaintiff in *Walsh* v. *Atlantic Research Associates, Inc.* 321 Mass. 57, 65–66, is present here. The defendant's wrongful conduct was also directly related to the accounts between the parties, and it was further intended to interfere with the processes of justice in this cause. Both parties may be barred with respect to an accounting by the rule of *Sipley* v. *Stickney*, 190 Mass. 43, that any wilful default in the performance of a contract bars recovery, but quite apart from that rule a court of equity ought not to be required to count the score between the pot and the kettle in a case like this. *Cornellier* v. *Haverhill Shoe Manufacturers' Association*, 221 Mass. 554, 561. *Howe* v. *Chmielinski*, 237 Mass. 532, 536. *Balcom* v. *Normile*, 255 Mass. 186. *Shikes* v. *Gabelnick*, 273 Mass. 201, 204–207.

*Leventhal* v. *Jennings,* 311 Mass. 622, 627. *Rayner* v. *McCabe,* 319 Mass. 311, 314, and cases cited.

When the parties ceased to do business under the contract the defendant had in his possession fifteen thousand shipping cartons, which had been furnished by the plaintiff and which the defendant appropriated to his own use. The defendant in his answer offers to pay for them. We infer that these cartons were property of the plaintiff left in the defendant's hands. Nothing in the conduct of the plaintiff prevents him from recovery for his own property which would otherwise unjustly enrich the defendant. *MacCormac* v. *Flynn,* 313 Mass. 547, 549. The final decree rightly awarded to the plaintiff the sum of $1,125 found by the master to be the value of the cartons.

The remaining issue in the case relates to the ownership and use of the trade mark "Sealskin." The master made a general finding that the plaintiff is the rightful owner of this name, but this finding is stated to rest upon the subordinate facts already recited. We therefore look to the master's subordinate findings and not to his conclusion from them.

We think it cannot rightly be held that the plaintiff has general ownership of the trade mark "Sealskin." We attach no importance in the circumstances to the fact that the plaintiff thought of this name first. The parties were in conference to devise a new name for the defendant's product which the plaintiff was to sell under the contract. They agreed upon the name for use in connection with their contract. Together they were to use it in a common enterprise. There could have been no expectation that either would use it to the detriment of the other. We think that each had a legal interest in the trade mark. The plaintiff, as the only person who was to sell "Sealskin" products, and who was to devote his whole time to the contract, would naturally become identified in the trade by the trade mark of the product he sold. But by the terms of the contract that product was to be wholly the product of the defendant. The plaintiff did not even know the formula for it and so far as appears cannot now manufacture the

product. The name would come to identify the product itself (and therefore the manufacturer) as well as the person who sold it. This would be true even though the name of the defendant as the manufacturer was not brought before the public in connection with the name "Sealskin." A manufacturer may acquire rights in the trade mark affixed to his goods, even though he himself remains anonymous. *Broeg* v. *Duchaine*, 319 Mass. 711, 712. *Shredded Wheat Co.* v. *Humphrey Cornell Co.* 250 Fed. 960, 963. *Dennison Manuf. Co.* v. *Thomas Manuf. Co.* 94 Fed. 651, 656. *Godillot* v. *Harris*, 81 N. Y. 263, 266. Schechter, The Rational Basis of Trademark Protection, 40 Harv. L. Rev. 813, 816–817. The rights of the parties in the trade mark must be adjusted with regard to these special circumstances which the parties must be deemed to have known when they began using it.

We think the plaintiff fails to show that he now has any right to use the trade mark "Sealskin." He could not use it in any practical manner for the purpose of identifying himself as the seller of goods without also, to some extent at least, sanctioning the false implication that the goods were those that he had formerly sold under the same trade mark, that is to say, goods manufactured by the defendant. On the other hand, since the trade mark "Sealskin" has become associated with the plaintiff as the seller as well as with the product itself, it would be unfair to the plaintiff to allow the defendant now to use the name on his product, because its use would tend to palm off the defendant's goods as goods sold by the plaintiff, who had formerly sold under that trade mark, and so to divert to the defendant trade that might otherwise come to the plaintiff. This, too, would be a deceptive use of the trade mark. The plaintiff has the right to continue in the business of selling protective skin "creams" manufactured by someone, and we cannot assume that he will not do so. He brought this suit to establish his rights at almost the same time at which the parties ceased to operate under the contract. Cases presenting problems somewhat similar to those here presented, but not decisive of this case, are *Lawrence-Williams Co.* v. *Société Enfants Gombault et Cie.* 22 Fed. (2d) 512, *Mulhens*

& Kropff, Inc. v. Ferd. Muelhens, Inc. 43 Fed. (2d) 937, and E. F. Prichard Co. v. Consumers Brewing Co. 136 Fed. (2d) 512.

We reach the foregoing conclusions in relation to the trade mark because of the nature of the contract between these parties and because of their joint adoption of the trade mark "Sealskin" for the purposes of that contract. We do not question the right of an importer, jobber, or dealer to acquire, apart from any contract, an exclusive right to a trade mark adopted by him alone for use wholly for his own purposes on articles sold but not manufactured by him. Nelson v. J. H. Winchell & Co. 203 Mass. 75, 82. Menendez v. Holt, 128 U. S. 514, 520.

In our opinion the wrongful conduct of the plaintiff in the course of carrying out the contract is not so closely connected with any future improper use of the trade mark by the defendant as to bar the plaintiff from relief with respect to such improper use. Westhampton Reservoir Recreation Corp. v. Hodder, 307 Mass. 288, 291–292. MacCormac v. Flynn, 313 Mass. 547, 549–550, and cases cited.

The interlocutory decree confirming the master's report is affirmed. The final decree is to be modified by omitting the first and second paragraphs wherein the plaintiff is declared to be the owner of the trade mark and the defendant is ordered to assign it to the plaintiff, and by omitting the sixth, seventh and eighth paragraphs relating to the accounting. Since no objection has been made to the tenth paragraph which in effect secures payment of the sum due from the defendant to the plaintiff by creating a lien upon the defendant's bank account, we do not consider its correctness. However, the reference in the tenth paragraph to the eighth paragraph (now struck out) should be omitted, and the paragraphs should be renumbered on account of the omissions. The defendant's counterclaim is to be dismissed. As so modified, the final decree is affirmed.

*So ordered.*