## H. FREEMAN & SON, Inc., v. F. C. HUYCK & SON, Inc.

District Court, N. D. New York.
April 21, 1934.

Neile F. Towner, of Albany, N. Y. (Harry S. Mesirov, of Philadelphia, Pa., of counsel), for plaintiff.

Watson & Looby, of Albany, N. Y. (John C. Watson and Charles H. Andros, both of Albany, N. Y., of counsel), for defendants.

COOPER, District Judge.

Plaintiff, a Philadelphia clothing manufacturer, sues defendant, a New York state corporation, upon a bill in equity seeking injunction and damages. The defendant denies that plaintiff is entitled to any relief, and asks for injunction against the plaintiff.

The defendant is a manufacturer of woolen products, having mills at Rensselaer, N. Y., and elsewhere.

Among the many products made by defendant is woolen cloth for clothing.

Defendant has for a long time used trademarks upon its woolen products, one consisting of the word "Kenwood," registered in

1913, and again in 1930, and claimed to have been used by defendant and its predecessors since 1895; and another consisting of the words "Kenwood Woolen Products" and "a panel in outline, in which is a pictorial representation of a mountain ram occupying a prominent position in the foreground and woods and a portion of a mountain range forming the background," registered May 14, 1929, trade-mark No. 256,433, and claimed to have been used on some of its wool products since 1918.

During the many years of manufacture of defendant's woolen products, such products, with the "Kenwood" trade-mark, have acquired widespread reputation for excellence of quality.

The defendant itself never manufactured men's or boys' clothing from its woolen cloth to any appreciable extent, but it did in a small way sell such clothing manufactured by others.

The defendant had never prior to 1928 granted to any clothing manufacturer the exclusive right to manufacture clothing from its cloth with the exclusive right to affix the "Kenwood" trade-mark on such clothing, though prior to 1928 the plaintiff had granted a nonexclusive right to Brickner, Levy, and Bibas, who did manufacture some clothing from defendant's cloth and affix a label bearing the words "Kenwood Special Fabrics" thereon.

The minimum annual output of woolen cloth for clothing at defendant's mills is about 5,000 pieces, averaging 50 yards per piece, or a total of some 250,000 yards.

The defendant was compelled to sell its cloth in the open market in competition with other clothing manufacturers, and such trade condition was not altogether satisfactory to defendant, because it was difficult to maintain its quality and price and sell sufficient cloth to take up its minimum output.

The plaintiff is a long-established clothing manufacturer in Philadelphia, Pa., enjoying a good reputation and doing a substantial business in the manufacture and sale of clothing, including men's and boys' suits and overcoats.

Hereinafter the word "clothing" will be used to indicate men's and boys' suits and overcoats made from defendant's cloth, unless otherwise indicated.

In 1928 the parties made an arrangement under which the defendant sold its cloth to the plaintiff and the plaintiff manufactured the same into clothing, affixed the defendant's trade-mark thereon and sold the same to the trade. The original arrangement was apparently for six months or one season, but it was renewed or continued and the relation continued in existence until September, 1933, when it was terminated by the defendant, which arranged with a Rochester, N. Y., concern to buy its cloth and make clothing therefrom and affix the trade-mark thereto.

Upon the terms and nature of the arrangement between the parties depend their rights and remedies.

As may be expected, the parties are not altogether in agreement as to the terms of the arrangement, and most sharply disagree about its nature and their respective rights and remedies thereunder.

Plaintiff claims that by a fair construction of the arrangement the defendant transferred to the plaintiff the exclusive and perpetual right to employ the Kenwood trade-mark and label upon clothing made by the plaintiff from defendant's cloth, together with the transfer of a potential business, namely, the business contemplated by the parties to be built up by plaintiff's manufacture and sale of clothing bearing the exclusive Kenwood label or trade-mark from defendant's cloth.

Plaintiff further contends that defendant cannot be permitted to destroy a good will which had been thus created and for destruction of which plaintiff has no adequate remedy at law, and that defendant should be enjoined from selling any of its Kenwood cloth to any other person for the purpose of permitting such person to manufacture clothing therefrom with or without the Kenwood trade-mark and label, and with or without the addition of certain designated words heretofore used by plaintiff on the Kenwood clothing made by it, together with damages alleged to have been sustained by plaintiff.

The defendant's view is that the arrangement between the parties was merely a license by the defendant to the plaintiff to use this Kenwood label and trade-mark, together with the additional words upon the label agreed upon between the parties, first, for a trial period of six months and then for a further indefinite period, and which license the defendant could terminate at any time at its pleasure without breach of faith, and without any legal damage or the right of any equitable relief on the part of the plaintiff, and which defendant did terminate in September, 1933.

There was no written contract, agreement, or embodiment of the terms of the arrangement between the parties. What the arrangement was must be largely determined from the statements and conduct of the parties. Some of these statements are embodied in letters. More are to be found in conversations between representatives of the parties.

The bill of complaint alleges that the plaintiff, through its president, Benjamin H. Freeman, originated the idea of adopting the trade-mark "Kenwood Wool Products" with the ram, as plaintiff's label, to be used in connection with various trade labels alleged to have been originated by the plaintiff and containing the word "Kenwood" upon such clothing manufactured by the defendant, and that the plaintiff submitted the idea to H. M. Ashby and the vice president and general manager of the defendant, and that the defendant, acting through said Ashby, approved the idea and the proposed use of such labels by the plaintiff as plaintiff's exclusive label upon Kenwood cloth to be purchased from defendant.

The fact is that one Dittman, in charge of sales for the plaintiff, and apparently having broad authority to represent the plaintiff, broached to an agent of the defendant, Mr. Gage, now deceased, at the New York offices of the defendant, the matter of an arrangement between the parties, by which the plaintiff would manufacture clothing from defendant's cloth and fix the Kenwood label thereon.

According to the plaintiff's agent Dittman, the defendant's representative Gage declared that he was without authority to make any such arrangement, and must submit it to the defendant, which he would do. Shortly thereafter Dittman and Gage had another conversation in which Gage informed Dittman that the defendants were willing to embark on such an arrangement. Dittman cannot remember that there was any six-month limitation of time or limitation to the spring season of 1929 as a trial period.

That the original arrangement was for six months or season's period is reasonably certain, however, from the instructions which Ashby gave over the phone to the New York agent, Gage, and which were embodied in a letter written by Gage. Neither Dittman nor Freeman, the president of the plaintiff company, recollect seeing this letter, but they do not deny receiving it. By a fair preponderance of evidence it seems to have been sent.

The pertinent paragraphs of the letter in question read as follows:

"H. Freeman & Son, Inc., to have exclusive right to use our registered label for the spring of 1929, with one exception, that is, if we deem it good business to allow Brickner, Levy & Bibas to use our label we are to have the privilege of doing so. * * *

"It is our intention to give you all the cooperation we can from our advertising department to help you put over Kenwood Cloth in a big way.

"Believe the above covers all the points we discussed.

"We are looking forward to the Spring Season with a great deal of satisfaction. Personally I believe it will be the means of continued associations, which will be both profitable to H. Freeman & Son and Kenwood Mills."

This statement harmonizes with the instructions which Ashby says he authorized Mr. Gage, the New York agent, the writer of the letter, to transmit to the plaintiff, except that the last sentence was clearly the personal expectation of Gage.

Mr. Ashby, the defendant's general manager and officer of highest authority, testified that his instructions to be transmitted to the plaintiff company for the initial arrangements were these (pages 513–516):

"I instructed Mr. Woodruff and Mr. Gage to offer the Freeman Company the exclusive right to use the Kenwood label for a six months period with no stipulation as to the amount of material to be taken but with freedom to us to sell to other clothing manufacturers without the right to use the label and exempt from the label restrictions, Brickner, Levy & Bibas * * * I instructed Mr. Gage and Mr. Woodruff to see that the control of the label was retained in our hands as to issue and preparation. * * *"

The weight of evidence is that the original arrangement was for a six-month period. The evidence shows no written agreement for the continuance of the arrangement nor the terms thereof. The parties seem to have gone on with the arrangement in the expectation that it would be to their mutual benefit.

Plaintiff's representative, Dittman, says that he again talked with the deceased Mr. Gage, with reference to the contemplated fall season of 1929. Mr. Dittman testified as follows (see record, pages 25 and 26):

"We had marketed the first few pieces, high spotting them, trying to get our dealer reaction and I next came to New York to talk to Mr. Gage and told him at that time that we would do a good job on this particular

fabric providing that we were properly protected with some sort of cumulative value of the past efforts of the Kenwood label and add our own ideas of our promotional thoughts and go after a national distribution with such a hook up. In other words I asked for exclusive protection as far as the label fabric was concerned."

"Mr. Gage told me that he was not in a position to O. K. an arrangement of this sort. He would have to get in touch with the mill. I later heard from Mr. Gage that he had taken the question up with Mr. Ashby, General Manager of the Kenwood Mill. * * * Mr. Gage told me * * * that Mr. Ashby felt that we were approaching it in the right way and the mill would be doing the right thing by agreeing to an exclusive proposition and he would let us have the label and would give us certain material. * * *"

"Neither Mr. Gage or Mr. Woodruff seemed to be in position to make any deliveries or any promises. Mr. Gage told me the thing would have to be taken up at the home office and Mr. Ashby would be the only man who could rule on such terms." (Page 138.)

Mr. Dittman also stated that he did not know very much about the arrangement that was actually entered into between the defendant and plaintiff with reference to the use of labels. (Page 151.) He also said that plaintiff had never before used a label on their clothing except for special promotional features. (Page 33.)

Mr. Dittman states what he understood the arrangement to be upon the question of label protection or infringement against the label. He was asked (pages 153 to 155):

"Q. Do you recall any conversation with reference to who was going to protect the label against infringement? A. The only question of label protection is that at all times I was given to understand by the members of the defendants organization with whom I came in contact, that the plaintiff would at all times protect so far as unfair competition by manufacture or unfair use of label. * * * Any time I ran across anything that was of a similar nature, I invariably wrote to the mill and called it to their attention."

It is clear from the plaintiff's own testimony that the defendant paid for all labels that were placed on the clothing. It is clear also that the words "authorized use of registered trade marks" appeared on all labels put by the plaintiff on the clothing manufactured from defendant's cloth, with two exceptions, one the Stern Bros., and the other

the Kenwood store in Chicago. The Kenwood store was a store conducted by the defendant.

It also appears from the plaintiff's testimony that in only two cases did the plaintiff's name appear on any of the labels. One was the case of Bullock & Co. of Los Angeles, Cal., and the other was the goods sold by the plaintiffs in their own retail store in Philadelphia, which bore the general standard label: "Kenwood Fabric, tailored by Freeman of Philadelphia."

Freeman, the president of the plaintiff company, testified (page 374) that Dittman of plaintiff made all arrangements between plaintiff and defendant for the use of the Kenwood labels. Freeman also testified (page 375) that he participated in the arrangement for permanent use of the label made with Ashby early in 1930, but gives no conversation concerning the same.

Plaintiff's president, Freeman, also testified that the first conversation he had with Ashby relative to the arrangement between the plaintiff and defendant was some time after the plaintiff began the manufacture of goods and put the label on. He testified as follows (page 313): "The purpose and arrangement that we had with Mr. Ashby were that we were to adjust our business as rapidly as we could do so until we got to the point where we would absorb the natural production of the mill, which approximated 5,000 pieces per year. Until we arrived at that point the Kenwood mills would have the right to sell the fabrics to other manufacturers, of course, without the label and we were to continue to buy our goods independently wherever we felt it necessary to do so until we achieved the final result. That is, which was the natural picture, their 5,000 pieces of goods was the natural amount of goods which we would ordinarily manufacture with our volume of business, that was the purpose and intent of the arrangement."

It is reasonably clear from this testimony that the goal of the arrangement was that plaintiff should take all of defendant's output of Kenwood cloth (5,000 pieces per year), and should buy and use no other cloth for clothing except the Kenwood cloth of defendant.

Freeman also testified that there was no time fixed for arriving at the goal, but that he figures it would be six or eight years (page 376), and that he "understood" the arrangement was permanent (page 378).

He also testified (page 382) that he believed that throughout the course of the ar-

rangement his company should have the right to the perpetual use of the Kenwood trademark and label.

Mr. Ashby, the defendant's general manager, also testified that the aim or goal of the arrangement was that plaintiff should take the entire production of 5,000 pieces. He said there was no definite time fixed when plaintiff should take the entire production.

It was contemplated by the parties that the use of defendant's cloth by plaintiff for the manufacture of such clothing and devotion of plaintiff's entire consumption to Kenwood cloth should make reasonable progress toward the goal. There was implied in this arrangement the utmost good faith and cooperation and such diligence commensurate with the circumstances as could reasonably be expected on the part of the plaintiff in the efforts to reach the goal.

It was expressed or implied as part of this arrangement that the defendant should receive such prices for its goods as was reasonable under the labor and trade conditions which might exist from time to time, yielding the defendant a reasonable profit on the manufacture of the cloth. The arrangement contemplated that the defendant should not be at all times met with competitive prices from other cloth manufacturers and be compelled to meet these prices. On the other hand, the defendant could not arbitrarily set its price so that it would reap an immoderate profit and handicap the plaintiff in selling the suits and coats made from the defendant's cloth.

This noncompetitive basis was understood from the beginning by both parties. The plaintiff, on the other hand, was to buy and pay for the defendant's cloth on this reasonable profit basis, and was not to quibble at the prices so long as the defendant did not exact a price not warranted by the quality of its goods and the varying labor and material costs from time to time plus such reasonable profit.

Without any more definite arrangement between the parties, the relations continued; their mutual interests and good intentions holding them together.

The clothing made by the plaintiff out of defendant's Kenwood cloth was extensively advertised, and the major portion of the expense was borne by the defendant.

Defendant complains of the plaintiff, asserting that plaintiff frequently tried to put the price on defendant's cloth upon a competitive basis, particularly with reference to flannel, which defendant was not making at the time the arrangement was made, but the manufacture of which plaintiff induced the defendant to undertake at some expense to the defendant for change of machinery or additional machinery, change of plant, etc.

If the output of flannel by the defendant were eliminated from the cloth sold by defendant to plaintiff, the purchase by plaintiff of defendant's cloth never came anywhere near the total output of the defendant's mill while the arrangement was in force. If the flannel is to be considered as included in the total output of the defendant's mill, then it is clear that the plaintiffs did question the price of the defendant's flannel and did put it on a competitive basis or attempt to do so. Nor was the plaintiff's consumption at all commensurate with defendant's output at any time.

Defendant complains also of plaintiff's general lack of diligence in building up this business of manufacture and sale of suits and clothing from defendant's cloth.

The record discloses several objections by defendant to plaintiff along these lines and promises by the plaintiff to increase its manufacture and sale of suits and overcoats from defendant's product. (Record, page 319.)

Plaintiff asserts that it did enter upon a campaign of renewed diligence at expense to the plaintiff, and that there was no justification for defendant's decision to cancel the arrangement on any such grounds.

Plaintiff, while denying that it had ever exercised anything but the utmost good faith, contends that defendant itself was at fault and prevented the plaintiff from exercising as much diligence and obtaining as much results as it might have obtained, had defendant itself been more diligent.

Defendant asserts that any delay on its part in delivering cloth to plaintiff was due to plaintiff's delay in giving firm orders and to plaintiff's questioning the price to be paid on the cloth.

These disagreements were usually straightened out in conference when plaintiff agreed to increase its sales of Kenwood cloth and defendant agreed to make more prompt deliveries. And the relations of the parties continued without an actual break between them until 1933.

A conference was had at Rensselaer early in the summer of 1933 and before June 9, 1933, at which Freeman of plaintiff, Ashby, Rumpf, Huyck, Braman, and Miller of defendants and a sales promotion man named Hallenbeck were present.

Freeman said he was considering whether or not Hallenbeck should be employed in a sales capacity in plaintiff's organization. Ashby said he would be interested in hearing Hallenbeck's plan for sales promotion, as there had been much discussion that Freeman's selling was weak and he was considering whether Hallenbeck would strengthen plaintiff's selling organization. (Pages 961, 962.) Hallenbeck outlined quite fully his plan and method of selling the Kenwood clothing and sales promotion.

Hallenbeck stated that the expense of so doing would be $40,000 to $50,000 the first year, and that it would take about two years to sell Kenwood clothing to an extent which would use all of defendant's production of 5,000 pieces per year, which would be all of plaintiff's production of clothing. (Pages 962–964.) Freeman thought such expense was too great. Defendant finally agreed to pay half this expense for the first year.

Mr. Freeman brought up the subject of protection for plaintiff in the exclusive use of Kenwood trade-mark label. Mr. Ashby said there would be a definite agreement in writing to protect plaintiff when plaintiff's sales of clothing took up defendant's production of 5,000 pieces per year. The language of the proposed agreement was to be exchanged between the parties.

Subsequently, Mr. Freeman decided not to go on with the Hallenbeck sales promotion plan because of the expense, but said that he would devote his own time to the promotion of the sales of Kenwood clothing.

Thereafter, and on June 9, 1933, the defendant's Mr. Ashby wrote the plaintiff:

"We have played along with you for several years at a heavy loss to us, in the hope that you would swing into a real selling Kenwood proposition. At no time have I had any thoughts but to develop this proposition with you, and while I have been impatient at your constant change of attitude—sometimes being keen for it and then being quite cold about it—I have believed that ultimately the evidence would accumulate to a point where you would be convinced that the sale of the Kenwood label garments was the best thing for you and for us, and would finally get behind it. At the start of this season I have had ample evidence from our Chicago store and our own store that the Kenwood line, as you carried it and stocked it, was inadequate to secure a decent clothing business for any retailer, and no matter how much effort he put into it, the results would be unsatisfactory because of the fact that it was not available when wanted. Ample evidence has accumulated to date that the merchandise is salable and that many sales are lost because it is not carried in stock by you.

"Very recently, you brought up of your own volition the question of employing Jue Hallenbeck to fortify your sales end, and because we were not prepared to assume the financial responsibility of selling your end, which is the finished garment, I have gathered the impression that you are less enthusiastic about the original proposition than you were before. In other words, consideration of the Hallenbeck idea, with our failure to do everything you wanted, seems to have thrown us backwards a good deal. Under the circumstances, I am accumulating a great deal of doubt as to your ability to carry out the program that I have in mind, because you do not seem to stay enthusiastic long enough to put the thing over. If I am once convinced of this fact, I shall have to find some other arrangement for putting over the establishment of the Kenwood label garments, which I am absolutely determined to do. If H. Freeman & Son are not able to carry this out, naturally we will have to look for someone else.

"As I stated before, I was perfectly willing to carry on patiently, awaiting the development of evidence in the market that this was a good thing for you. If, when such evidence has developed, you do not have the courage to seize it, then I have evidently made a mistake in tying up with your concern. I am speaking very frankly now because I believe we have reached a crisis in our mutual relations, and I am more disturbed by your hesitation and change of attitude than I am by the slowness of the development of the actual conditions.

"In conclusion, I want to state that under no circumstances will I allow our company to invest any further effort in the marketing of cloth or its clothing without a proper collateral development of the nationally advertised Kenwood label idea. This is fundamental to our picture and under no circumstances will I give it up." (Defendant's Exhibit F.)

There is no reply to this letter in evidence, but one or more conferences were had in the latter part of June or early part of July. There was no final break at this time.

About the latter part of August, Mr. Dittman, for the plaintiff, called defendant's office on the phone and talked with Mr. Ernest Rumpf, secretary and comptroller of the defendant, and inquired the price at which the defendant would make flannels for manufac-

ture of suits by the plaintiff. Mr. Dittman stated that he had an offer for quite a large quantity of flannel from a competitor at around $1.70 per yard, and wanted to know what price defendant would require for its flannel.

Mr. Rumpf replied that he was not able to tell what the price was at present, but it would not be less than $2 per yard and it might be higher. On September 1, 1933, apparently following this conversation, the defendant telegraphed Mr. Rumpf, care of the Kenwood Mills, as follows: "Urgent have approximate prices flannel and Waylite by return wire."

There had been previous disagreements about prices. Some of the goods ordered by plaintiff during the summer of 1933 included seven pieces of flannel and seven pieces of Waylite, the order for which was received by defendant August 7th and was apparently for samples.

The amount and kind of orders for goods sent by plaintiff to defendant during the summer of 1933 is disputed, but need not be decided. It is certain that plaintiff did not order all of its flannel from defendant, but did buy a substantial quantity thereof from a competitor, the Hockanum Company.

On September 25th defendant's Mr. Ashby wrote the plaintiff at Philadelphia with reference to a proposed meeting, saying he was unable to give the date, but it would probably be Friday of that week. In that letter Mr. Ashby wrote as follows:

"I have been reviewing the situation between your company and our own and have about come to the conclusion that the best interests of both would probably be served by severance of our relationship. I am not quite sure about this but that is the way it looks to me right now.

"Your recent purchase of flannel from Hockanum would indicate that we are not able to make stuff cheap enough for your purpose, and the failure to hold many of your good customers shows that there is something wrong—either with your line-up or with ours—or the co-ordination of the two.

"Under these circumstances, I would not expect you to refrain from purchasing any outside material for the spring season, if it is to your advantage to do so, whether we continue our relationship or not.

"I will let you know as soon as I can meet you in New York with a fairly definite picture in my own mind and will look forward to seeing you at that time."

On September 27, 1933, plaintiff's Mr. Freeman wrote Mr. Ashby of the defendant company:

"Have yours of the 25th and I am startled somewhat at the conclusion which you have come to, but, quite willing to sever our connections if it appears to be in the mutual interests of both of us. However, I will see that our purchase of flannel from the Hockanum mill would in no way interfere with the sale and promotion of the Kenwood Flannel inasmuch as we have just concluded a plan whereby the firm of H. Freeman & Son had intended to promote and sell nothing but Kenwood products, and we have made arrangements for a separate division to handle everything else which we produce.

"There is no question of our failure to coordinate properly, but, this is a matter which I distinctly understood we were going to correct and I was awaiting your return from your vacation to take up all the various subjects which we held in abeyance while you were away."

Then a few days after the receipt of this letter Mr. Freeman came up to defendant's mill and had a conference with Mr. Ashby and other representatives of the defendant, and endeavored to get the defendant directors to go on with the arrangement previously existing. Mr. Ashby apparently endeavored to persuade the directors to that end, and informed Mr. Freeman that he would notify him later of the decision of the board of directors.

On September 3, 1933, Mr. Ashby telegraphed the plaintiff as follows: "Directors have carefully considered all you said but have decided to adhere to their decision and make change."

It is probably true that at that time arrangements had been made between the defendant and other new manufacturers, Keller-Herman-Thompson of Rochester, N. Y.

About January 25, 1934, the defendant sent out letters to the trade announcing that, beginning with the 1934 spring season, the Kenwood fabrics would be tailored exclusively by a special division of the Rochester concern. It is exceedingly probable that this letter went to many, if not all, of the retailers to whom the plaintiff had been selling the Kenwood clothing.

The plaintiff had never confined its manufacture of clothing to defendant's cloth, and continued to buy cloth from other mills and manufacture it into clothing of various kinds and sell it to its retailers.

The proportion of plaintiff's net business which came from the manufacture of defendant's cloth is shown in the following tables for the years 1928 to 1933:

| Year. | Total. | In Kenwood. | In Other Clothing. |
|---|---|---|---|
| 1928 | $2,000,000.00 | $ 59,468.95 | $1,940,531.05 |
| 1929 | 2,350,710.98 | 224,117.98 | 2,126,593.00 |
| 1930 | 2,215,586.66 | 230,327.37 | 1,985,259.29 |
| 1931 | 2,080,931.68 | 110,661.91 | 1,970,269.78 |
| 1932 | 1,145,930.98 | 499,672.35 | 646,258.63 |
| 1933 | 1,138,692.01 | 261,068.99 | 877,623.02 |

It would appear that plaintiff's 1933 sales were curtailed by cancellation of the arrangement in September, 1933, which prevented plaintiff from making additional sales in the fall of that year.

The absence of any definite irrevocable transfer of the trade-mark rights and potential business is indicated by lack of any definite statements, oral or written, showing such positive, definite, perpetual transfer and by letters and conduct inconsistent with such understanding.

On August 11, 1932, the plaintiff through Mr. Freeman, wrote Mr. Miller of the defendant, complaining of low price fleeces being sold to Ullman Bros. In concluding the letter, Mr. Freeman said: "It was our understanding that the Kenwood Mills had the resources and patience to await results from the development of our plan and if these are not the facts the sooner we know it, the better it will be for us." (Plaintiff's Exhibit 49.)

The letter of Ashby of June 9, 1933, above set forth (Defendant's Exhibit 9), though self-serving, is inconsistent with an unconditional understanding, and is made the more significant because there was no prompt or vigorous protest to the position taken therein, as would naturally have been done had there been a definite, irrevocable transfer.

When defendant's Mr. Ashby wrote the final letter of September 25th, supra, indicating intention to sever relations, Freeman's reply of September 27th, supra, nowhere claims a definite permanent transfer of trade-mark and rights, nor does it protest that defendant was committing a positive breach of the understanding. It was not until lawyers were consulted that such position was taken by plaintiff.

The defendant's letters to the trade after the making of the arrangement and the advertisements inserted by or with the consent of defendant, and for which defendant paid the larger part (Plaintiff's Exhibits 15 and 28, etc.), are consistent with plaintiff's contention that a definite permanent transfer of rights was made at the beginning, or at least after the first season or six-month period. But they are also consistent with a license revocable at any time, though not with a relation expected to be speedily terminated.

So they are also consistent with the arrangement as construed by the court later herein.

About the only significant evidence indicating a definite and permanent arrangement between the parties is plaintiff's testimony of the admission by defendant's Mr. Ashby at a conference in New York in the latter part of June or the early part of July, 1933. At this conference, according to Mr. Freeman, the following were present: Mr. Ashby and Mr. Miller of the defendant, Mr. Sumner, the defendant's advertising agent, Mr. Dittman, and Mr. Freeman of the plaintiff, and Mr. McAvoy and Mr. Hirsch, prospective purchasers of Kenwood clothing.

Mr. Freeman testifies that Mr. McAvoy and Mr. Hirsch raised the question of whether or not the plaintiff would continue to have the Kenwood trade-mark and label to furnish the Kenwood clothing or whether it might be subject to withdrawal.

Mr. Ashby said, according to Mr. Freeman (page 331), that the defendants had made a careful survey, and: "We have had a long experience with Freeman and we are entirely satisfied that they will accomplish * * * that Freeman (the plaintiff) was fast coming to the point where the plaintiff would accomplish the defendant's objective and that the arrangement was a permanent one."

This testimony was substantially corroborated by McAvoy himself and by Dittman. Mr. McAvoy put Mr. Ashby's reply in this form: "There is no worry about that, Mr. McAvoy. We have made an analysis and have checked up on the different manufacturers and have definitely decided that the arrangement with Freeman & Sons is everlasting, is permanent."

It is quite true that neither Mr. Miller of the defendant company nor Mr. Sumner, their advertising agent, was called upon by defendant to testify as to this conversation. Mr. Ashby tersely denied it, but gave no explanation of what was said on the subject. It is not to be denied that the weight of evidence is with the plaintiff in this respect, but, in view of the fact that, within a month prior to that time, Mr. Ashby had sent the plaintiff's Mr. Freeman the letter of June 9, 1933

(Defendant's Exhibit F), in which he had given notice that the progress which the plaintiff was making was very unsatisfactory, and that, unless something were done, the arrangement would be canceled, while this statement must be taken in the nature of an admission at the time intended to influence the possible customers, it is not an admission which outweighs the other evidence in the case, nor sufficient to enable the plaintiff to establish by a fair preponderance of evidence that the arrangement was a definite and permanent and perpetual transfer of the trademark and exclusive right to use the Kenwood cloth.

In view of the indefiniteness of the evidence, it may well be that both parties did not have the same understanding of the terms of the arrangement. If there was no actual meeting of minds, there was certainly no contract for a definite, present, and permanent assignment or transfer of exclusive right to the use of the Kenwood trade-mark and exclusive right to manufacture and sell Kenwood clothing from defendant's cloth as plaintiff contends and as Mr. Freeman "understood." (Page 373.)

If it were a present, definite, permanent arrangement at the beginning, then the goal need not be reached in the six or eight years, which Mr. Freeman thought would be required to reach the goal (page 376), but which he admits was not agreed or even mentioned.

The goal need never be reached if it was a present, definite, permanent, and unconditional transfer as plaintiff must establish, and plaintiff could play fast and loose with the defendant, buying what it would from defendant and from others also, never reaching the goal, but nevertheless holding defendant permanently bound.

Such a construction of the arrangement is unreasonable. There is nothing to support the view that defendant ever intended to make any such arrangement.

While some of the evidence is more consistent with defendant's contention that defendant granted a mere revocable license to plaintiff to use its trade-mark on clothing manufactured from defendant's cloth, the weight of evidence, however, supports neither the plaintiff nor defendant in their respective contentions as to the nature of the arrangement between the parties. The most reasonable construction of all the statements, letters, acts, and conduct of the parties is that the arrangement between them was a tentative and conditional assignment of the perpetual, exclusive right to use the defendant's trade-mark and exclusive right to use its cloth in the manufacture of clothing, and that such transfer or assignment should not be effective as a permanent and perpetual transfer until the plaintiff should manufacture and sell sufficient Kenwood clothing to take up defendant's output of 5,000 pieces per year on a noncompetitive basis, and that plaintiff should confine its entire product to the manufacture and sale of Kenwood clothing, and should make no other.

No time was fixed for arriving at the goal of the arrangement.

Failure to state a definite time and make a definite contract did not necessarily leave the parties in a situation of plaintiff being a mere licensee, with his right subject to revocation at any time.

A more reasonable construction is that the plaintiff should have a reasonable time under the circumstances and conditions existing and including economic conditions, although it should be said that the first six-month period terminated in the early part of 1929, and at that time there was less depression and things industrial were at the height of prosperity. Assuming, therefore, a view most favorable to plaintiff, namely, that it was a conditional transfer to become absolute within a reasonable time, and that a reasonable time had not elapsed in the fall of 1933, so far as time alone was concerned, the defendant would still have a right to insist that plaintiff was not making reasonable progress under conditions, and was not endeavoring to perform the contract as contemplated by the parties under a fair construction of the terms thereof.

These things stand out:

After four or five years plaintiff did not devote more than 50 per cent. of its clothing manufacture to Kenwood cloths in any year, and in 1931 it was less than 10 per cent. of its total clothing business. At no time did the plaintiff arrive at more than 40 per cent. of the defendant's output of 5,000 pieces per year. Defendant contends that this was also a constant loss to defendant, as indicated in a letter of June 9th, where defendant's agent said: "We have played along with you for several years at a heavy loss to us."

Accompanying these things was the failure on the part of the plaintiff to buy the plaintiff's cloth on a noncompetitive basis and rely upon defendant's good faith as to price. Plaintiff's agent Dittman at page 241 was asked:

"Q. Did you ever protest to defendants that prices were out of line with other manufacturers? A. Well, a good deal higher than competing cloth, in which case we dropped it.

"Q. Dropped what, the Kenwood Cloth? A. Dropped the Kenwood idea. We said 'We cannot compete. We will forget the idea for this season.'"

And in 1933, after the defendant's letter of June 9, 1933, and after the conversation had, at which the Hallenbeck effort to take over the sales promotion was discussed, we still find this dispute about prices.

In the latter part of August, 1933, the plaintiff's Mr. Dittman called the defendant's Mr. Rumpf on the phone and told him about the Hockanum flannel offered at a cost of $1.70 per yard, and was informed that defendant could not sell it for that price, and it would doubtless be at least $2.

So that defendant found the plaintiff making little or unsatisfactory progress toward the goal of using all of defendant's output and plaintiff devoting itself exclusively to Kenwood flannel and utter failure to do so by buying flannel at noncompeting prices.

Defendant was therefore justified in deciding that plaintiff had not, and would not or could not, within any reasonable time, arrive at the goal involving these essential features: (a) Sufficient consumption of Kenwood cloth to take 5,000 pieces; (b) purchase of Kenwood cloth on a noncompetitive basis; (c) exclusive devotion of plaintiff to Kenwood cloth. So that, the contract being such as the court sees it, the plaintiff in equity is not entitled to an injunction restraining the defendant from terminating the arrangement.

Plaintiff's cases upon which it relies to support this contention that this was a definite and perpetual transfer by defendant of the trade-mark, labels, and exclusive right to sell clothing made from Kenwood cloth are: Kidd v. Johnson, 100 U. S. 617, 619, 25 L. Ed. 769; Harris v. Brown, 202 Pa. 16, 51 A. 586, 90 Am. St. Rep. 610; Tanner-Brice Co. v. Sims, 174 Ga. 13, 161 S. E. 819, 822; Coca-Cola Bottling Co. v. Coca-Cola Co. (D. C.) 269 F. 796; Prof. Jaeger v. Jaeger Co., 44 R. P. C. 83 (Chan. Div. 1917) 44 R. P. C. 437 (Ct. of App.); Dennison Mfg. Co. v. Thomas Mfg. Co. (C. C.) 94 F. 651, 656; Federal System of Bakeries v. Bachrach, 13 T. M. R. 429 (U. S. D. C. W. D. Pa.); George B. Graff Co. v. H. C. Cook Co., 55 App. D. C. 136, 2 F.(2d) 938; Bennett & Sons v. Farmers' Seed & Gin Co. (C. C. A.) 288 F.

365; Andrew Jergens Co. v. Woodbury, Inc. (D. C.) 273 F. 952.

One of plaintiff's chief reliances is the Coca-Cola Case, 269 F. 796. This came before the District Court on a motion for temporary injunction and a motion to dismiss. The case was decided on the complaint of which the written contract was a part. Injunction was granted. The contract was materially different from the arrangement here. It was a definite, unlimited transfer to the plaintiff of the exclusive right to bottle Coca-Cola to be purchased from the defendant at a fixed price, bottled by plaintiff and sold within a certain defined territory. The defendant agreed to manufacture no more Coca-Cola than sufficient to fill the orders of plaintiffs and other selling agents outside of plaintiff's territory. Plaintiff was given the exclusive right to use the name "Coca-Cola" and all the trade-marks and designs for labels then owned and controlled by defendant. There were no restrictions except against adulteration of the Coca-Cola. There were no conditions except that upon the demand of the defendant the plaintiff should keep a specified supply of the bottled Coca-Cola on hand at a specified place, failing which the plaintiff should forfeit his exclusive rights, not to the whole territory, but to the territory within a 100-mile radius of the place where default occurred. Plaintiff was to forfeit its rights upon failure to keep the agreement.

The plaintiff had operated under the contract for twenty-one years, procured the establishment of 588 plants by sub-bottlers, and had with the sub-bottlers expended about $20,000,000 in bottling plants besides large sums in building up the business. The bill charged that the contract was of a permanent nature, and that all the subsequent acts and conduct of the parties was confirmatory thereto.

It is clear that in the Coca-Cola Case there was a present definite, irrevocable transfer of rights, and so understood by the parties for twenty-one years.

Here we have only a tentative and conditioned transfer, not to be a permanent and perpetual transfer until the happening of a future event, which had not happened after a reasonable time, which might never happen, and when the defendant was justified in saying that the plaintiff was not keeping the spirit and intent of the arrangement.

The next most important reliance of the plaintiff apparently is the case of George B. Graff Co. v. Cook, 55 App. D. C. 136, 2 F.

(2d) 938, 939. This was not an action on a contract, nor a suit in equity to restrain one who had assigned a trade-mark and potential business from breaching his agreement. It was a trade-mark interference proceeding. The defendant was a manufacturer of clips, and sought to obtain registration for the trade-mark "Vise." In 1911 it made an arrangement with Graff, the individual by which he undertook the sale of the clips. Graff built up a very considerable business not only in these clips but in other similar devices, all of which were sold under the trade-name of "Vise."

The plaintiff company succeeded to the rights of Graff.

About 1913, at Graff's request the defendant company stamped on the clips bearing the trade-mark "Vise" the name of the Graff Company, and that practice continued until 1921. Upon the application for registration of "Vise" as defendant's exclusive trade-mark, the court said: " * * * for about eight years the public was given to understand that the origin or ownership of the goods, to which the mark was applied, was the Graff Company. Under such circumstances, we think the Cook Company is estopped to prevent the continued use of this mark by the Graff Company, provided the mark is so used as clearly to indicate that the product is that of the Graff Company. * * * Now to permit the Cook Company to register the mark, upon the basis of its exclusive right to use it, would be inequitable and violative of the underlying purpose of the Trade-Mark Act. See Hanover Milling Co. v. Metcalf, 240 U. S. 403, 36 S. Ct. 357, 60 L. Ed. 713."

The difference between this and the case at bar is manifest. Manifestly this is not the situation here.

Andrew Jergens v. Woodbury, Inc., was a suit to enjoin an alleged trade-mark infringement and unfair competition. The plaintiff's suit was based on the claim of an exclusive right, but the court held there was no exclusive right because of an intervening transfer of some rights to third persons. The case has little analogy, and it is not necessary to discuss it.

Dennison Mfg. Co. v. Thomas Mfg. Co. (C. C.) 94 F. 651, is another case of trade-mark infringement and unfair competition. It is likewise without application here.

Bennett & Sons v. Farmers' Seed & Gin Company (C. C. A.) 288 F. 365, likewise is without application to the nature of the arrangement between the parties.

It seems unnecessary to discuss in detail the remainder of the cases, for there is no similarity of fact and little analogy of law.

Because of the view taken herein of the nature of the arrangement or contract between the parties, it is not necessary to discuss plaintiff's numerous citations of authority, nor is it necessary to pass on defendant's contention that the whole arrangement is void under the New York statute of frauds because it is a contract which by its terms is not to be performed within a year.

### Labels.

Quite a bit of testimony was devoted to the origin of certain labels. This was directed, not to the Kenwood trade-mark nor to the words "authorized use of the trade mark," but in part to the color or shape of the labels, and, more particularly, to the names which were placed on the labels in addition to the trade-mark. These additional words were in part trade-names or names intended to suggest a characteristic of the clothing and yet not merely descriptive names.

No attention will be paid to the evidence on the subject of the labels other than to that bearing on the additional words placed upon the labels. No label bears more than one of these names. It is a fair and reasonable inference from the evidence that, while the defendant expressly retained control of the trade-marks and labels, the plaintiff originated the ideas for such distinctive words. There is some dispute as to whether the plaintiff communicated the same to the defendant which had them worked up and printed on the labels, or the plaintiff had the labels printed without consultation.

The defendant paid the costs of manufacturing these labels.

The defendant retained the right to approve the labels, and that the same could not be placed on the garment without their approval, and that defendant paid for them, is clear from Defendant's Exhibits A and B, dated September 14, 1932, and October 10, 1932, in which defendant's agents Braham and Woodruff wrote the plaintiff in part as follows:

"H. V. Freeman & Son, 1427 Vine Street, Philadelphia, Pa. Gentlemen: Following our Mr. Miller's letter to you of September 12th, our attorneys advise us that 'Ram-Fleece' has not been covered by any other company.

"However, in their opinion, we could not hope to succeed in protecting 'Ram-Fleece,'

for the reason that it is 'descriptive' in character.

"They do say we can undoubtedly register 'Ramafleece' and we have instructed them to go ahead with such word, which we trust will be equally satisfactory to you in connection with our less expensive fleece overcoat fabric.

"Mr. Woodruff will be in New York tomorrow or Thursday, and we will have him get in touch with you at once regarding Ramafleece labels.

"It is out of the question for you to use the Ramcrest labels as these labels belong strictly to our bed blanket line, and might very well be used another time for bed blankets.

"With respect to the labeling of our products, there are always complications of this sort which come up from time to time, and we believe it would be well hereafter if you would take them up with us before going ahead. As you know, we reserve all rights covering the labelling of our fabrics, and it will save confusion if you refer such matters to us for decision.

"Yours very truly,
"F. C. Huyck & Sons,
"Kenwood Mills."

"H. Freeman & Son, 1427 Vine Street, Philadelphia, Pa. Gentlemen: Unfortunately, I was not at the mill when the Discussion regarding Ramafleece blankets came up, but on my return was told that you were having a design prepared for submission to us for our approval and that to save time you were to send us ten copies of the design so that we could arrange for protecting the label.

"Later I heard through Bob that again to save time you were having the labels woven but that before using these they would be submitted to us for approval and that only ten samples would be sent us so that we could protect the name.

"Nothing has come to hand until I received a bill from Montabert Company on October 5th covering approximately 1,000 labels and again another bill of October 10th covering another 1,500. Both of these bills had a sample label attached, but these two are the only ones that have come to hand. I am faced with a condition that I am asked to pay for labels that we have not approved. Under the circumstances, I feel that I will have to hold these until your visit to Albany when we can discuss them and come to a definite

decision regarding the acceptability of a design.

"Yours very truly,
"F. C. Huyck & Sons,
"Kenwood Mills.
"J. E. Woodruff."

Plaintiff's Mr. Dittman admitted that defendant paid for all labels (page 155), and also in substance admitted that the plaintiff retained control of the use of the labels.

But, assuming all this, the plaintiff has right in these labels, since it originated them for the express purpose of putting them upon Kenwood clothing manufactured and sold by plaintiff.

One of the first names plaintiff devised to be placed on labels was "Featherlite." But it was discovered after some use of this label on the Kenwood clothing manufactured by plaintiff that some one else had registered a trade-mark covering "Featherlite."

Thereupon the plaintiff proposed that this name should be changed to "Fleecelite." This was acceptable to the defendant, and the labels were made and put upon the clothing. For the purpose of mutual protection, the defendant had the word "Fleecelite" registered as a trade-mark, taking the registration in defendant's name.

The burden of proof is that defendant originated the label and that down to the breach of relations of the parties it was used only on Kenwood clothing manufactured by the plaintiff.

These distinctive names were not in existence at the time and were no part of the tentative conditional transfer by defendant to plaintiff.

They were thereafter originated by plaintiff and used exclusively by plaintiff. True, they were used, so far as appears, exclusively on Kenwood clothing. But, even so, there was no intent or agreement that defendant should ever have any rights or interest therein except to have them used by plaintiff on Kenwood clothing. When defendant withdraws its Kenwood cloth from plaintiff, it does not acquire any greater interest in these distinctive names than it had before, but it loses what rights it had therein.

To now permit the defendant to take this "Fleecelite" label and the others later referred to and transfer them to the Rochester concern to benefit by the time, money, and effort expended by the plaintiff to popularize the word "Fleecelite" and the other trade words would be inequitable.

Since defendant no longer permits the plaintiff to make the Kenwood "Fleecelite" clothing, plaintiff should not be deprived of its exclusive rights to the name "Fleecelite" and the other names, and the fact that the defendant has registered "Fleecelite" as its trade-mark is in no wise conclusive that the plaintiff has no rights therein. That registration was clearly for mutual benefit and with the co-operation of plaintiff. The case of George B. Graff Co. v. Cook Co., 55 App. D. C. 136, 2 F.(2d) 938, supra, is not without analogy in this regard.

The decree may provide that defendant shall assign and transfer the trade-mark rights to "Fleecelite" to the plaintiff.

■ A number of other names were devised by plaintiff and approved by defendant and put on labels by the plaintiff on the Kenwood clothing manufactured by it. Some of these like "Cheviot" and some others are descriptive names not capable of trade-mark rights, which any one may use at any time, and this court of equity has no power to grant exclusive rights to such names to either party thereto.

■ But there are certain other names originated by plaintiff and approved by defendant and popularized at least to some extent at plaintiff's expense, though they were not registered as trade-marks. In equity, these names also should be the property of the plaintiff, and the decree may so provide. Such names are "Waylite," "Lagorra," "Somerset," and "Drakeweave."

Even if the arrangement between the parties were void under the statute of frauds, that would have no bearing on this question, for that statute could not be made the instrument of fraud. Nor would defendant be in any better position if the arrangement between the parties were held to be a revocable license, as defendant contends.

Decree herein may also restrain the defendant from using, or permitting any one else to use, any of these five names on any Kenwood clothes manufactured by the Rochester concern or any one else.

■ Defendant sent out letters in January, 1934, to the trade, doubtless including plaintiff's customers, notifying the trade that Kenwood clothing was manufactured by this Rochester concern, and not mentioning the plaintiff except by the necessary inference arising from the statement that defendant was the exclusive manufacturer of Kenwood clothing. Plaintiff seeks injunction against this. If the defendant had on hand Kenwood clothes which it made under the canceled arrangement which is the subject of this suit, plaintiff might be entitled to a temporary injunction restraining the statement that the Rochester concern was the exclusive manufacturer of Kenwood clothing until the plaintiff had disposed of such clothing, because it would give rise to the very natural inference that plaintiff's Kenwood clothing was not genuine, or spurious.

However, the parties have arranged between themselves for defendant to purchase all Kenwood clothing and cloth that plaintiff had at the time these letters were sent out, and the court cannot grant the plaintiff any relief to prevent the defendant sending out letters to the trade, even to the plaintiff's customers, stating that this Rochester concern is the exclusive maker of Kenwood clothing.

Since there is no reasonable probability that plaintiff can satisfactorily establish damages as to the matters in which injunction is granted, no reference to that end will be made.

There being no longer any occasion to restrain plaintiff from using the Kenwood trade-mark on clothing, since it has neither cloth nor clothing bearing such label, no injunction is granted to the defendant, though the court will retain jurisdiction to that end.

Findings of fact and conclusions of law in conformity with this opinion may be submitted.

The decree may be entered in accordance herewith, with taxable costs and disbursements to the plaintiff.

If parties cannot agree upon the form of the decree, the same may be settled upon three days' notice.